In re MF GLOBAL HOLDINGS
LIMITED SECURITIES
LITIGATION.

This document relates to all
securities actions.

DeAngelis v. Corzine.

No. 11 Civ. 7866(VM).

United States District Court,
S.D. New York.

Nov. 12, 2013.

Bennett Leon Spiegel, Bruce S. Bennett, Jones Day, Los Angeles, CA, Scott Jason Greenberg, Jones Day, New York, NY, for MF Global Holdings Limited.

Brian C. Kerr, David A.P. Brower, Brower Piven, A Professional Corporation, Jeffrey Craig Block, Whitney Erin Street, Block & Leviton LLP, New York, NY, Jason Mathew Leviton, Scott A. Mays, Berman Devalerio, Boston, MA, for DeAngelis.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ...................................................288

II. BACKGROUND .....................................................291
 A. THE PARTIES..................................................292
 1. Plaintiffs and the Class ............................................292
 2. Officer Defendants.................................................292
 3. Independent Director Defendants....................................292
 4. Underwriter Defendants and Senior Notes Underwriter Defendants.....293
 B. FACTUAL ALLEGATIONS .......................................293
 1. DTA and Net Income ..............................................293
 2. RTM Strategy ....................................................296
 3. MF Global's Collapse..............................................300
 C. PROCEDURAL HISTORY ........................................301

III. LEGAL STANDARD...............................................301
 A. PLEADING STANDARDS: RULE 12(b)(6), RULE 8(a), RULE 9(b),
 AND THE PSLRA ..............................................301

B. THE EXCHANGE ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .302
 1. Section 10(b) and Rule 10b–5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .302
 a. Misstatements or Omissions of Material Fact . . . . . . . . . . . . . . . . . . . . .303
 b. Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .305
 2. Section 20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .306
C. THE SECURITIES ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .308
 1. Section 11 and Section 12(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .308
 2. Section 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .308

IV. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .309
A. PLEADING STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .309
 1. Exchange Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .309
 2. Securities Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .310
B. MATERIAL MISSTATEMENTS OR OMISSIONS . . . . . . . . . . . . . . . . . . . . . . .311
 1. DTA and Net Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .311
 a. Whether the Statements about DTA Are Opinion . . . . . . . . . . . . . . . . .312
 b. Whether the CAC Pleads Subjective and Objective Falsity . . . . . . . . .313
 c. Bespeaks Caution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .315
 2. RTM Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .316
 a. False or Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . .316
 b. Bespeaks Caution / PSLRA Safe Harbor . . . . . . . . . . . . . . . . . . . . . . .318
C. EXCHANGE ACT DEFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .319
 1. Strong Inference of Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .319
 2. Control Persons Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .321
D. SECURITIES ACT DEFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .321
 1. Liability for Forms 10–Q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .321
 2. Reliance on Audited Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .322
 3. Evidence of Purchase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .323
 4. Control Persons Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .324

V. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .324

\* \* \*

Lead Plaintiffs The Virginia Retirement System and Her Majesty The Queen In Right Of Alberta, along with several other named plaintiffs (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), filed this Consolidated Amended Securities Class Action Complaint (the "CAC") against defendants Jon S. Corzine ("Corzine"), J. Randy MacDonald ("MacDonald"), and Henri J. Steenkamp ("Steenkamp"; collectively, the "Officers" or the "Officer Defendants"); defendants David P. Bolger, Eileen S. Fusco, David Gelber, Martin J. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan (collectively, the "Independent Directors" or the "Independent Director Defendants");[1] defendants Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs & Co., J.P. Morgan Securities LLC, Merrill, Lynch, Pierce, Fenner & Smith Incorporated, and RBS Securities Inc. (collectively, the "Underwriters" or the "Underwriter Defendants"); and defendants BMO Capital Markets Corp., Commerz Markets LLC, Jefferies & Company, Inc., Lebenthal & Co., LLC, Natixis Securities North America Inc., Sandler O'Neill & Partners, L.P., and U.S. Bancorp Investments, Inc. (collectively, the "Senior Notes Underwriters" or the "Senior Notes Underwriter Defendants").[2]

---

**1.** The Officer Defendants and the Independent Director Defendants are, collectively, the "Individual Defendants."

Plaintiffs' fourteen-count CAC (Dkt. No. 330) asserts violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"); Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"); Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"); Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k ("Section 11"); Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2) ("Section 12(a)(2)"); and Section 15(a) of the Securities Act, 15 U.S.C. § 77o(a) ("Section 15(a)"). Defendants moved to dismiss all counts of the CAC (*see* Dkt. Nos. 357, 360, 364, 366, 368, 373), and the parties have fully briefed the motions.[3]

2. The Independent Director Defendants, the Underwriter Defendants, and the Senior Notes Underwriter Defendants are, collectively, the "Securities Act Defendants." All defendant groups—the Officer Defendants, the Independent Director Defendants, the Underwriter Defendants, and the Senior Notes Underwriter Defendants—are collectively referred to as "Defendants."

3. The Court has reviewed the parties' filings in this matter: Memorandum of Law in Support of Defendant Jon S. Corzine's Motion to Dismiss the Consolidated Amended Securities Complaint, dated October 19, 2012 ("Corzine's Motion") (Dkt. No. 369); Memorandum of Law in Support of Defendant J. Randy MacDonald's Motion to Dismiss, dated October 19, 2012 ("MacDonald's Motion") (Dkt. No. 361); Memorandum of Law in Support of Henri Steenkamp's Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated October 19, 2012 ("Steenkamp's Motion") (Dkt. No. 374); Memorandum of Law in Support of the Independent Directors' Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated October 19, 2012 ("Independent Directors' Motion") (Dkt. No. 358); Memorandum of Law in Support of Underwriters' Motion to Dismiss, dated October 19, 2012 ("Underwriters' Motion") (Dkt. No.

## I. *INTRODUCTION*

If ever there was a federal securities fraud case that offered the parties a unique opportunity to depart from scripted litigation strategy and give Rule 1 of the Federal Rules of Civil Procedure a fair chance, this was it: an action that could have served as a prime candidate for litigants to test that exceedingly rare prospect.

At the initial conference on this matter, the Court likened the events surrounding the catastrophic collapse of MF Global Holdings Limited ("MF Global" or the "Company") in the closing days of October of 2011 to a massive train wreck in which thousands of people—passengers, crew, bystanders, and others—were seriously injured upon sudden impact with a force the

365); Memorandum of Law in Support of the Senior Notes Underwriters' Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated October 19, 2012 ("Senior Notes Underwriters' Motion") (Dkt. No. 367); Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss, dated December 18, 2012 ("Plaintiffs' Opposition"); Reply Memorandum of Law in Support of the Officer Defendants' Motions to Dismiss the Consolidated Amended Securities Complaint, dated February 1, 2013 ("Officers' Reply") (Dkt. No. 454); Defendant Randy J. MacDonald's Reply Memorandum of Law in Further Support of His Motion to Dismiss the Amended Complaint, dated February 1, 2013 ("MacDonald's Reply") (Dkt. No. 448); Reply Memorandum of Law in Further Support of the Securities Act Defendants' Motions to Dismiss, dated February 1, 2013 ("Securities Act Defendants' Reply") (Dkt. No. 450); Supplemental Reply Memorandum of Law in Further Support of the Underwriters' and the Senior Notes Underwriters' Motion to Dismiss, dated February 1, 2013 ("Underwriters' and Senior Notes Underwriters' Reply") (Dkt. No. 451); and Reply Memorandum of Law in Further Support of the Independent Directors' Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated February 1, 2013 ("Independent Directors' Reply") (Dkt. No. 452).

victims could not see coming. As Plaintiffs relate the events, at the culmination of what occurred at MF Global in the course of a few days, $1.6 *billion* had disappeared from the company. Cash from customer accounts could not be found. Initially, no one could explain what happened to the money. Much later on, its trail was traced through circuitous international channels to MF Global corporate accounts, where the funds had been improperly commingled and used to cover questionable company transactions.

The Court's train wreck analogy was meant as a hint giving a form of guidance. As the doctrine of res ipsa loquitur suggests, when an unusual accident strikes during the particular defendant's watch and control over the circumstances, especially in a case of immense magnitude such as the disaster at issue here, some facts about the calamity's proximate cause may be presumed: at minimum that someone somewhere did something wrong—and presumably not anyone directly hurt by the misfortune. Bearing this premise in mind as a starting point, the Court's observation suggested a practical framework within which the parties could examine the legal issues the case raises and consider pursuing the exceptional route to the most speedy, economical, and just resolution possible. With the assumption up front that something here went terribly awry, the parties could more easily turn to the search for relevant evidence, thus enabling them much sooner to sort out legal issues and to apportion responsibility in a manner consistent with the fuller record. Unfortunately, the suggestion of such an economical shortcut held no sway. Apparently, efficiency was not in the cards.

And so, before further investigation into Plaintiffs' claims as to what set in motion such an extraordinary chain of events, Defendants seem convinced that no one named in this lawsuit could possibly have done anything wrong. So confident are they of the validity of this perception that, at what must have amounted to an enormous expenditure of money, time and energy,[4] they seek a court ruling dismissing the complaint in its entirety, thus barring any discovery that might shed light on remaining unknowns that bear momentous consequences for the victims who have suffered the losses.

■ MF Global's demise, however, is not a complete mystery. In their CAC, Plaintiffs compiled an extensive factual recitation, which the Court must accept as true for the purposes of ruling on Defendants' motions, comprising 695 paragraphs, filling 218 pages, and pleading 14 claims of unlawful conduct arising from the events leading to the eventual disintegration and bankruptcy of MF Global on October 31, 2011. As detailed below, Plaintiffs' allegations suggest a long, knowing, and consistent course of action on the part of the various Defendants, wrongful conduct that cumulatively produced the harmful outcome that came to pass. Moreover, this account is not based on pure speculation or the traditional pleading foundation grounded primarily upon information and belief. Rather, Plaintiffs' portrayal of the facts possesses an added measure of reliability and plausibility. It draws heavily from the public record of information generated by various investigations performed by government regulators and congressional committees.[5]

---

**4.** Defendants' numerous motions and replies generated 184 pages of briefing memoranda, not counting the accompanying voluminous declarations and exhibits.

**5.** Plaintiffs make use of reports issued by the Trustee for the SIPA Liquidation of MF Global Inc., the Trustee for the Chapter 11 Bankruptcy of MF Global Holdings Ltd., and the

As highlights of the most salient of Defendants' wrongful acts, Plaintiffs assert that MF Global: inflated its profits by recording deferred tax assets on its balance sheet even in light of evidence, known to the Officers, that the Company would never realize those assets; engaged in a high-risk strategy of investing in European sovereign debt while simultaneously concealing the size of and risk posed by those investments; repeatedly increased its European sovereign debt investments, in spite of concerns expressed on numerous occasions by its chief risk assessment officer and in violation of the company's own trading limits—trading limits that started at $500 million and within 15 months exceeded $6 billion in exposure; undertook this risky investment strategy despite numerous internal reports that indicated a lack of sufficient internal controls to manage MF Global's liquidity and capital requirements; fired a chief risk officer who questioned whether MF Global's new investment strategy was prudent and replaced him with another officer who initially supported the new strategy, but who later also voiced similar warnings about the company's financial condition; and used intra-day transfers from various MF Global accounts, including those involving customer funds, to cover increasing liquidity demands.

Despite these dire signs of mounting crisis, MF Global continued to issue securities in public exchanges, repeatedly assuring investors that everything at the Company was running smoothly, that it possessed sufficient liquidity to cover its financial exposure, and that it had put in place strong internal controls sufficient to check against any management failures.

Plaintiffs purchased MF Global securities issued while, unknown to them, these circumstances were internally-unfolding and the company was unraveling. They brought suit against the numerous Defendants they claim were aware of the events and contributed to bringing them about, specifically the MF Global officers, directors, and underwriters—all twenty-three of them.

Defendants, all twenty-three of them, now ask the Court to dismiss the complaint—every claim in it. Curiously, they suggest that Plaintiffs' exhaustive pleadings give Defendants both too much detail and too little—more information than necessary to present a concise statement of the facts, and yet not enough to give Defendants fair notice of why they are being sued. By Defendants' account, and giving a broad interpretation to the logic and end result of their theories, nothing happened at MF Global for which a single one of the twenty-three Defendants could possibly bear any legal responsibility. As Defendants read the complaint and construe the applicable statutes, nothing in law or legal theory now exists—not even simple negligence principles—under which any of the individuals and entities involved in MF Global's management, or in its issuance of securities during the Company's destruction, can be held accountable for any of the wrongdoing that Plaintiffs claim.

---

United States Treasury Department's Office of Financial Research, and of hearings conducted before the United States House of Representatives Committee on Agriculture, the United States Senate Committee on Agriculture, Nutrition, and Forestry, and the United States House of Representatives Financial Services Subcommittee on Oversight and Investigation. (*See* CAC ¶ 2.) In evaluating a motion to dismiss, the Court may consider any documents cited and relied upon or incorporated by reference in the complaint as the factual sources of the pleadings. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

The natural implications of this extreme perspective are far-reaching. Defendants' contentions would suggest that the fall of MF Global Plaintiffs portray either never happened, or, if it did occur, that—since no one associated with the Company played a causal role in the events—perhaps the debacle must have been the fateful work of supernatural forces, or else that the explanation for a spectacular multi-billion dollar crash of a global corporate giant is simply that "stuff happens"—instantaneously, of its own accord, without any knowledge or causal agency whatsoever by any one of the many sophisticated business executives in charge of the company's day to day affairs. Perhaps worse yet, a fair inference that follows from the conception of the law Defendants advocate is that, even assuming the truth of everything Plaintiffs allege, what transpired at MG Global over the course of the year before the Company's collapse—including the sudden unexplained disappearance of $1.6 billion of customer money—represents the governing industry standard for doing business, the acceptable model for how corporate managers should be permitted to run a company's affairs in the ordinary course, insulated from accountability that not only Plaintiffs but also the public should rightfully expect from issuers of securities. Were the Court to dismiss the CAC, it would effectively have to find that even assuming the compelling facts pled here, viewed against the applicable standard of review, there is no viable construction of law under which Defendants' actions would give rise to any plausible claim that some violation of the securities statutes occurred. Such a ruling would be tantamount to raising the pleading bar to unattainable heights, in essence elevating the test so as to demand levels of details and precision far surpassing anything that the threshold of the federal securities laws, or even the *Iqbal/Twombly* standard, could have contemplated. To end this prologue on a higher lyrical note, if on this record as pled Plaintiffs cannot make out a plausible claim here, they could not make it anywhere.

Accordingly, upon a review of Defendants' numerous motions in the light of Plaintiffs' account of facts which the Court accepts as true, the Court is not persuaded by Defendants' arguments. In evaluating the application of the law that Defendants argue would allow the outcome they seek at this stage of the litigation, the Court's assessment may be simply stated: It cannot be. Thus, for the reasons stated below, Defendants' motions are DENIED.

## II. *BACKGROUND* [6]

Plaintiffs' asserted claims arise from events that led to the 2011 collapse of MF Global.[7] Briefly stated, Plaintiffs allege that MF Global's public filings and the public statements made by MF Global's officers materially misled investors in two ways. First, Plaintiffs claim that MF Global failed to record a valuation allowance against its Deferred Tax Assets ("DTA") until October 25, 2011, even though Generally Accepted Accounting

---

**6.** Except where otherwise noted explicitly, the factual summary below is derived from the CAC and the documents cited or relied upon for the facts pled therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. *See Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 180 (2d Cir.2008) (*citing GICC Capital Corp. v. Tech-*

*nology Fin. Grp., Inc.,* 67 F.3d 463, 465 (2d Cir.1995)); *see also Chambers,* 282 F.3d at 152. Except where specifically quoted, no further citation will be made to the CAC or the documents referred to in it.

**7.** MF Global filed for bankruptcy on October 31, 2011 and is not a party to this action.

Principles ("GAAP") [8] required MF Global to take that valuation allowance earlier. Second, Plaintiffs fault MF Global and Defendants for misstatements and omissions related to the Company's proprietary investments in European sovereign debt through repurchase-to-maturity ("RTM") transactions (the, "RTM Strategy"). According to Plaintiffs, MF Global and Defendants (1) purposefully concealed the proprietary nature of the RTM transactions, (2) materially misstated and failed to disclose how the RTM strategy posed significant liquidity risks to the Company, and (3) misrepresented and failed to disclose weaknesses in MF Global's ability to prevent a liquidity crisis of the kind that caused MF Global's eventual collapse.

## A. THE PARTIES

### 1. Plaintiffs and the Class

Plaintiffs assert that they bring this action "individually and on behalf of a proposed class of persons and entities who purchased or otherwise acquired" certain interests in MF Global between May 20, 2010 and November 21, 2011 (the "Class Period"). (CAC ¶ 1.) The Class consists of persons and entities who acquired, during the Class Period, (1) MF Global's publicly traded securities; (2) MF Global's common stock in a June 2010 secondary offering (the "Secondary Offering"); (3) MF Global's 1.875% Convertible Senior Notes due February 1, 2016 (the "2016 Notes"), issued in February 2011; (4) MF Global's 3.375% Convertible Senior Notes due August 1, 2018 (the "2018 Notes"), issued in July 2011; (5) MF Global's 6.25% Senior

Notes due August 8, 2016 (the "Senior Notes"), issued in August 2011; and (6) MF Global securities through employee benefit plans.

### 2. Officer Defendants

Defendant Corzine served as Chairman of the MF Global Board of Directors (the "Board") and as Chief Executive Officer ("CEO") of both MF Global and MF Global's broker-dealer subsidiary, MF Global Inc. ("MFGI"), from March 23, 2010 to November 4, 2011. Defendant MacDonald served as MF Global's Chief Financial Officer ("CFO") from April 2008 through March 2011.[9] Defendant Steenkamp served as MF Global's CFO from April 2011 through the end of the Class Period. The CAC alleges that the Officer Defendants had access to information about MF Global that was not disclosed to the public, and that they "were all involved in drafting, producing, reviewing and disseminating the financial statements and other reports at issue in this case during their tenure with the Company." (CAC ¶ 32.) The CAC also claims that the Officer Defendants "were able to and did control the content of MF Global's various press releases, SEC filings and other public statements during the Class Period." (CAC ¶ 33.)

### 3. Independent Director Defendants

The Independent Director Defendants each served on MF Global's Board during the Class Period. The CAC alleges that the Independent Directors had access to

---

8. "GAAP is the official standard for accounting accepted by the SEC and is promulgated in part by the Financial Accounting Standards Board ('FASB') and American Institute of Certified Public Accountants ('AICPA')." (CAC ¶ 88.)

9. The CAC alleges that MacDonald served as CFO through April 2011, but MF Global's public filings with the SEC, of which the Court can take judicial notice, see In re Alstom SA Sec. Litig. (Alstom I ), 406 F.Supp.2d 346, 352 (S.D.N.Y.2005), show that MacDonald left that position in March of 2011.

information about MF Global that was not disclosed to the public.

#### 4. *Underwriter Defendants and Senior Notes Underwriter Defendants*

The Underwriter Defendants and Senior Notes Underwriter Defendants each served as an underwriter for one or more of the public offerings at issue: the Secondary Offering, the 2016 Notes, the 2018 Notes, and the Senior Notes.

### B. *FACTUAL ALLEGATIONS*

The CAC outlines two categories in which Defendants made material misstatements or omissions: (1) statements about MF Global's DTA and net income, and (2) statements about MF Global's risk appetite, internal controls, and liquidity management, particularly in light of the RTM Strategy.

#### 1. *DTA and Net Income*

"Deferred Tax Assets are losses, credits and other tax deductions that may be used to offset taxable income in the future." (CAC ¶ 84.) GAAP permits a company to record DTA as assets on its balance sheet, but only to the extent the company is "more likely than not" to realize the DTA. (*Id.*) The company must take a valuation allowance against—that is, not count as an asset on its balance sheet—the amount of the DTA that the company is not likely to realize.

GAAP requires the company to weigh "all available evidence, both positive and negative," to determine whether the company should take a valuation allowance against its DTA. (CAC ¶ 92.) That a company suffered cumulative losses in recent prior years is significant negative evidence

against recording DTA. In the face of such evidence, the company must have counteracting positive evidence in order to support its decision not to take a valuation allowance against its DTA. Such positive evidence can include tax planning strategies if those strategies are prudent and feasible and would result in later realization of the company's DTA.

As of the 2010 fiscal year, which ended on March 31, 2010, MF Global had suffered cumulative losses over its previous three fiscal years, both in its U.S. operations and worldwide. During that time, MF Global primarily performed client-based commodities broker services and earned income through commission fees and interest on client accounts. As interest rates fell in the late 2000s, MF Global lost a substantial part of its income base. New CEO Corzine sought to turn around the Company's fortunes by turning MF Global into an investment bank. The Company implemented a plan to complete that conversion in three to five years.

On May 20, 2010—the first day of the Class Period—MF Global issued a press release to report its financial results for both the fourth quarter of the 2010 fiscal year and for the full fiscal year. The press release claimed that MF Global's financial statements were prepared in accordance with GAAP. MF Global did not take a valuation allowance against its DTA. In an investor conference call held that same day, MacDonald indicated that the DTAs in issue were not "as at risk" [10] as other deferred tax assets that MF Global held. (Decl. of Benjamin E. Rosenberg, Ex. 1 at 6, Dkt. No. 370.) Corzine also failed to answer a question posed to him about MF Global's DTA.

---

**10.** The CAC mistakenly quotes MacDonald as saying that the DTAs were not "at risk."

(CAC ¶ 317.)

In its 2010 Form 10–K, filed with the SEC on May 28, 2010 and signed by all Individual Defendants, MF Global again represented that its financial statements were in accordance with GAAP and did not record a valuation allowance for $117.9 million of MF Global's DTA. MF Global provided the following disclosure: "We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income. If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuation allowances against these deferred tax assets." (CAC ¶ 320.) The 2010 Form 10–K acknowledged that, under GAAP, "[a] valuation allowance is provided for deferred tax assets when it is more likely than not that some portion of the deferred tax assets will not be realized." (CAC ¶ 321.) The 2010 Form 10–K did not disclose the positive and negative evidence that MF Global weighed to conclude that a valuation allowance was not required.

On August 5, 2010, MF Global issued a press release with its financial results for the first quarter of the 2011 fiscal year. The results, which claimed to be in accordance with GAAP, showed a small profit. In a conference call held that same day, Corzine emphasized that MF Global had "returned to profitability for the first time in six quarters on a GAAP basis." (CAC ¶ 339.) While Corzine and MacDonald noted that MF Global would have to write down some of its DTA, MacDonald assured investors that the remaining DTA was "not as at risk." (CAC ¶ 340.) The next day, August 6, MF Global filed its Form 10–Q for the first quarter of the 2011 fiscal year with the SEC. The Form 10–Q was signed by Corzine and MacDonald and also contained the financial results in the press release, purportedly in accordance with GAAP.

MF Global made similar disclosures in November 2010 (for the second quarter of the fiscal year) and February 2011 (for the third quarter of the fiscal year). The Company continued not to record a valuation allowance against its DTA and to represent that its financial statements were in accordance with GAAP. MF Global's Form 10–Q for the third quarter of fiscal year 2011, filed with the SEC on February 3, 2011 and signed by Corzine and MacDonald, specifically noted that MF Global had not taken a valuation allowance against its DTA "because the Company believes that it is more likely than not that these deferred tax assets will be realized in the future. Although realization is not assured, the Company anticipates that realization of these assets will occur." (CAC ¶ 373.)

In May 2011, MF Global disclosed financial information for the fourth quarter of fiscal year 2011 and for the full fiscal year; again, the financial information was purportedly prepared in accordance with GAAP. On its 2011 Form 10–K, filed with the SEC on May 20, 2011 and signed by all Individual Defendants except MacDonald, MF Global reported a DTA valuation allowance of $19.5 million and a net DTA of $108.3 million. The 2011 Form 10–K included the following disclosure about DTA, identical to the disclosure on the 2010 Form 10–K: "We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income. If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuation allowances against these deferred tax assets." (CAC ¶ 390.)

The 2011 Form 10–K, unlike the 2010 Form 10–K, offered a justification for MF Global's decision not to take a valuation allowance against the full DTA. The 2011 Form 10–K acknowledged that MF Global

was "in a three-year cumulative pre-tax loss position at March 31, 2011 in many jurisdictions in which [it did] business," and that such a loss position "is considered negative evidence in assessing the realizability of deferred tax assets." (CAC ¶ 391.) But the Company "concluded that the weight given this negative evidence is diminished due to significant non-recurring loss and expense items recognized during the prior three years." (*Id.*) MF Global also identified "sufficient positive evidence to overcome this negative evidence" that fell into three categories:

> The first is the reversal of existing taxable temporary differences. Second, we forecast sufficient taxable income in the carry forward period. We believe that future projections of income can be relied upon because the income forecasted is based on key drivers of profitability that we began to see evidenced in fiscal 2011. Most notable in this regard are plans and assumptions relating to the significant changes to our compensation structure implemented in fiscal 2011, increased trading volumes, and other macro-economic conditions. Third, in certain of our key operating jurisdictions, we have a sufficient tax planning strategy which includes potential shifts in investment policies, which should permit realization of our deferred tax assets. Management believes this strategy is both prudent and feasible.

(CAC ¶ 392.) MF Global's Form 10–Q for the first quarter of fiscal year 2012, filed with the SEC on August 3, 2011, included substantially the same disclosures.

The CAC attacks the sufficiency of each category of positive evidence. According to the CAC, GAAP rules generally do not permit projections of future income to overcome the negative evidence from cumulative losses in recent years. The CAC also alleges that MF Global's new investment strategy, described in detail below, was high-risk and unsustainable, such that MF Global's "projections of future income were not sufficient 'positive evidence' to avoid taking a full valuation allowance against the Company's U.S. DTA." (CAC ¶ 121.)

The CAC also claims that projections of increased income from MF Global's changes in compensation structure "were unreliable and, more importantly, could not have offset the Company's DTA." (CAC ¶ 122.) The CAC alleges that MF Global's increased hiring in certain areas offset layoffs in other areas, such that the Company did not achieve its target compensation-to-revenue ratio.

Finally, the CAC notes that tying MF Global's tax planning strategies to its "shifts in investment policies" could not offset the Company's DTA. To the contrary, the CAC claims, "the Company was simply unable to engage in any 'shifts in investment policies' without first incurring significant additional liquidity strains or losses ... neither of which was 'prudent' or 'feasible.'" (CAC ¶ 135.) [11]

Eventually, MF Global determined that it could no longer avoid taking a valuation allowance against its DTA. On October 25, 2011, MF Global issued a press release with its financial results for the second quarter of fiscal year 2012. The Company reported a loss of $191.6 million. A valuation allowance of $119.4 million against MF Global's DTA accounted for more than half of the loss. According to Steenkamp, most of that valuation allowance was taken against the Company's U.S. DTA. The

---

11. Further to the point, Plaintiffs claim, an MF Global internal document created in September 2011 and presented to the Board in October 2011 suggests that any shifts in investment policies would create large losses, rather than gains. (CAC ¶ 138.)

CAC alleges that MF Global's "disclosure of its (long overdue) valuation allowance against its U.S. DTA significantly contributed to the Company's collapse." (CAC ¶ 87.)

### 2. *RTM Strategy*

When Corzine was named MF Global's CEO, he faced pressure from credit rating agencies to demonstrate that the Company could be profitable in the future. To achieve this goal, Corzine implemented the RTM Strategy, also known within MF Global as the "Corzine Trade," beginning in July 2010. As MF Global began to implement the RTM Strategy, Corzine emphasized several times that the Company's new business plan was done to support the Company's client-based services. The strategy involved coordination between MFGI and MF Global U.K. Limited ("MFG–UK"), which was MF Global's affiliate in the United Kingdom. Plaintiffs allege that Corzine "communicated with MFGI and MFG–UK personnel directly to carry out these RTM transactions." (CAC ¶ 155.)

The RTM Strategy worked as follows: first, MFG–UK purchased European sovereign debt securities on the London Clearing House ("LCH") exchange. MFG–UK then sold those securities to MFGI. Next, MFGI and MFG–UK entered into an RTM agreement. MFGI thus sold the securities to MFG–UK while the firms simultaneously entered a contract for MFGI to repurchase the securities on the securities' maturity dates, at the same price plus a pre-negotiated interest payment. MFG–UK, which now owned the securities, then engaged in a similar repurchase transaction with a counterparty through the LCH. The repurchase date on that transaction was scheduled for two days before the securities' maturity date. MFG–UK thus bore the risk of default on the security, and MFGI was responsible for maintaining liquidity to cover the possible default. MFGI was also expected to provide MFG–UK with funds to cover margin calls or anticipated margin calls from the LCH.

The RTM Strategy provided MF Global with several accounting advantages. First, the RTM transactions could be counted as sales, rather than as loans, even though MFGI and MFG–UK were contractually obligated to repay the final counterparty for the securities. The obligation to repay was thus "de-recognized"—it did not appear as a liability on MF Global's balance sheet. The RTM transactions also allowed MF Global to report the transactions as gains at the time of the sale, notwithstanding the subsequent obligation to repay the sale price. Finally, because no liability appeared on MF Global's balance sheet, the RTM transaction did not factor into MF Global's value-at-risk ("VAR") calculations. Plaintiffs allege that the RTM Strategy thus allowed MF Global "to invest in high-risk assets while keeping them off its balance sheet, frontload gains and tout misleading VAR metrics—all of which created the artificial appearance of a turnaround in the Company's ailing business." (CAC ¶ 146.)

The RTM Strategy also exposed MF Global "to market risk, liquidity risk and capital risk." (CAC ¶ 160.) Market risk existed due to the possibility that the securities might default or be restructured. MF Global also was subject to margin calls from counterparties and to regulatory capital reserve requirements. When the security traded in the RTM transaction fell in value, MFGI was subject to corresponding margin calls that strained liquidity. A failure to post the required margin could cause MFGI to default on the transaction and require MF Global to repurchase the security at that time.

As part of its risk management strategy, MF Global's Board imposed limits on trading of European sovereign debt. In March 2010, that trading limit was $500 million. Corzine sought to increase that limit, and his efforts were met with concern by then-Chief Risk Officer ("CRO") Michael Roseman ("Roseman"). Roseman eventually agreed to increase the trading limit to $1 billion in around July or August 2010.

By mid-September 2010, MF Global had breached that trading limit. Corzine sought to increase the trading limit to $1.5 billion and also took steps to move the RTM transactions off of MF Global's balance sheet. Roseman again expressed concern over MF Global's exposure. But despite Roseman's concern, MF Global's exposure to sovereign debt continued to increase, reaching $3.5 to $4.0 billion in late October 2010—even though the trading limit had not yet been increased.

Corzine asked Roseman to request from the Board an increase in the trading limit to $4.75 billion. Roseman expressed concerns about the capital and liquidity risks associated with the increase, and he presented those concerns both to Corzine and to the Board. At a November 2010 meeting, the Board approved the request and increased the trading limit to $4.75 billion.

Even after the November 2010 Board meeting, Roseman continued to express his concerns to Corzine. MF Global eventually dismissed Roseman as CRO in early 2011. Several former MF Global employees believe "that Roseman was fired because he warned senior management that the Company was taking on too much risk." (CAC ¶ 187.) Other MF Global employees shared Roseman's concerns. But the person hired to replace Roseman, Michael Stockman ("Stockman"), publicly supported Corzine's risk management strategy.

In mid-January 2011, the MF Global Board forbade any increase in the European sovereign debt portfolio without express permission from the Board. Yet on February 3, 2011, MF Global exceeded that limit; Corzine, though made aware of the breach, did not inform the Board. Instead, in mid-February 2011, Corzine and Stockman sought an increase in the trading limit from $4.75 billion to $5 billion, with a temporary increase to $5.8 billion until March 31, 2011. Some Board members "expressed concerns about the level of exposure," but the Board approved the increase. (CAC ¶ 200.) In March 2011, the Board granted a request from Corzine and Stockman to extend the temporary $5.8 billion limit until September 2011.

By April 27, 2011, the trading limits had been breached yet again. Corzine directed Stockman to prepare a request to increase the European sovereign debt trading limit to $9.75 billion. Stockman, for the first time, expressed concerns to Corzine about MF Global's ability to support its RTM Strategy. The Board approved the request only in part, increasing the trading limit to $6.6 billion.

The Board heard other concerns about MF Global's risk management during the Class Period. An April 2010 report from the Company's Internal Audit Department (the "IAD") noted that technological limitations prevented MF Global from accurately forecasting liquidity risks. A May 2010 report from the IAD expressed concerns with MF Global's ability to handle the risks associated with its expansion beyond its traditional client facilitation services. Months later, an October 2010 report from the IAD noted the same problems. The October 2010 report "expressed concern that the absence of reliable liquidity reporting tools" and the excessive dependence on assistant treasurer Edith O'Brien ("O'Brien") to manage li-

quidity issues represented risks to MF Global. (CAC ¶ 211.)

Technological concerns and limitations lasted into 2011. In March 2011, an IAD report noted that some regulatory reports were produced through spreadsheets that were "typically not secure and [were] susceptible to human error." (CAC ¶ 212.) A June 2011 IAD report referred to liquidity monitoring and forecasting as "manual and limited" and also identified "numerous and significant gaps between the policy and existing practices." (CAC ¶ 213.) Plaintiffs allege that these issues were not addressed [12] and that failures in liquidity monitoring directly led to MF Global's downfall.

Plaintiffs allege that, in light of the risks that the RTM Strategy posed to MF Global and in light of the Company's risk management weaknesses, MF Global's public statements on those subjects were inadequate. In MF Global's May 20, 2010 press release, Corzine suggested that the Company would seek to expand its activities only after "ensur[ing] the appropriate controls [were] in place." (CAC ¶ 325.) Corzine made similar representations on a May 20, 2010 investor conference call.

MF Global's 2010 Form 10–K touted the Company's risk management. The form also recognized that any new strategies would be conducted within that risk management scheme:

> We expect to increasingly recognize trading income as part of our ongoing activity for our clients in various markets, and to selectively increase our risk taking, generally making fuller use of our current risk appetite and operating within the authority delegated by our board of directors.

(CAC ¶ 330.) The 2010 Form 10–K stated that MF Global would "consider the inherent operational risk in new products, systems, and business activities as they are developed or modified." (CAC ¶ 332.) Finally, the 2010 Form 10–K assured investors that MF Global would maintain sufficient capital and liquidity to respond to the risks of market events. The same disclosure appeared in several of MF Global's subsequent SEC filings.

MF Global's 2011 Form 10–K contained similar disclosures. The form emphasized that MF Global's new investment strategies would take place "within the authority delegated by [its] Board of Directors." (CAC ¶ 400.) The 2011 Form 10–K discussed how MF Global's Operational Risk Management Framework "establishes an effective environment" to create risk controls and "to help ensure transparency, awareness, and accountability of risks." (CAC ¶ 407.) According to the 2011 Form 10–K, MF Global operated within "defined risk mandates as delegated by the CRO" and tracked compliance through end-of-day and intra-day monitoring. (CAC ¶ 409.)

The Officer Defendants also stressed MF Global's commitment to risk management in various other public statements. For example, in an August 5, 2010 earnings call, MacDonald stated that "the Company maintains a strong liquidity position." (CAC ¶ 346.) Corzine and MF Global also downplayed the risks that the Company faced. Corzine told investors that the Company was "not taking enormous market risk in executing [its] strategy." (CAC ¶ 349.)

MF Global's August 6, 2010 Form 10–Q similarly stated that MF Global's business

---

12. Indeed, Plaintiffs allege that Stockman and Corzine refused to authorize an enhancement to MF Global's risk management system that would improve its technological infrastructure. (CAC ¶ 197–98.)

"does not generally present a substantial cash liquidity risk" and that MF Global would "have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets." (CAC ¶ 350.) The same disclosure appeared in all of MF Global's SEC filings for the remainder of the Class Period. The Officer Defendants made other public statements to the same effect—that MF Global had sufficient liquidity to withstand potential stresses on its various investment positions.

MF Global did not openly acknowledge the exposure and risk resulting from the RTM Strategy until its February 3, 2011 Form 10–Q. The disclosure came in response to a request from MF Global's outside auditor, PricewaterhouseCoopers LLP, for the Company to publicly disclose its RTM exposure. That disclosure read as follows:

> The Company also enters into securities financing transactions that mature on the same date as the underlying collateral. The Company accounts for these transactions in accordance with the accounting standard for transfers and servicing and recognizes a gain or loss on the sale/purchase of the collateral assets, and records a forward commitment. The Company derecognizes the collateral assets as sold when the transactions are accounted for as sales, and recognizes the collateral assets as purchased when the transactions are accounted for as purchases. In these transactions, the Company has exposure to the risk of default of the issuer of the underlying collateral assets, such as U.S. government securities or European sovereign debt.

(CAC ¶ 384.) The February 3, 2011 Form 10–Q identified $7.56 billion in derecognized RTM transactions, but contained no further discussions of the specific risks that the RTM Strategy posed. Similarly, the 2011 10–K and the August 3, 2011 Form 10–Q identified the value of derecognized RTM transactions, but did not further disclose any risks from those transactions.

MF Global's disclosure in its 2011 Form 10–K garnered attention from federal regulators. The Financial Industry Regulatory Authority ("FINRA") expressed its concern that, because the RTM transactions exposed MF Global to market and credit risks, MF Global might not have enough capital reserves to cover risks caused by the RTM Strategy and to comply with SEC rules. MF Global resisted FINRA's attempts to change MF Global's capital requirements, and Corzine made a personal appeal to SEC regulators. But the SEC accepted FINRA's interpretation of the SEC rules, and FINRA required MF Global to reserve further capital to cover the RTM transactions. On September 1, 2011, MF Global filed a Form 10–Q/A that amended its previous Form 10–Q to comply with FINRA's ruling.

What MF Global did not disclose, Plaintiffs allege, is that MF Global met those capital requirements only through intra-company transfers. Moreover, the CAC claims, the required change "had a devastating (but undisclosed) impact on the Company's already-existing liquidity problem" and forced MF Global to rely on more intra-day transfers to meet liquidity demands. (CAC ¶ 236.) The intra-day transfers included use of funds associated with MF Global's traditional futures commission merchant ("FCM") activities—including from accounts involving customer funds.

At the same time, MF Global and its officers sought to assure investors that the RTM Strategy posed minimal risks. At a July 9, 2011 conference, Corzine suggested that MF Global's principal trading activi-

ties made the Company "less risky." (CAC ¶ 422.) In a July 28, 2011 earnings conference call, Steenkamp claimed that MF Global "believe[d] market risk to [the European sovereign debt] trades is minimal as these are held to maturity." (CAC ¶ 424.)

Indeed, Corzine and Steenkamp held firm on these claims even while MF Global was on the brink of collapse. On October 24, 2011, MF Global issued a letter from Steenkamp that declared that MF Global's RTMs posed a "limited market risk." (CAC ¶ 447.) And on October 25, 2011, Corzine stated on an investor conference call that "the structure of the [RTM] transaction[s] themselves essentially eliminates market and financing risk." (CAC ¶ 452.)

### 3. MF Global's Collapse

Just before MF Global filed its October 25, 2011 Form 10–Q—in which the Company took the $119.4 million valuation allowance against its DTA—MF Global's senior management informed credit rating agencies that it was about to report a substantial loss. As a result, Moody's downgraded MF Global's debt to just above junk status.[13] While Corzine and Steenkamp sought to assure investors that MF Global's financial position remained strong, the market reacted negatively. MF Global's stock fell by 48 percent on the day it filed the Form 10–Q.

Moreover, the RTM Strategy began to unravel. MF Global's counterparties demanded additional margin to cover the transactions, which in turn raised eyebrows among investment exchanges and government regulators. The credit ratings agencies also downgraded MF Global's debt yet again, with Moody's and Fitch lowering MF Global's debt rating to junk status.

MF Global struggled to meet the increased liquidity demands. On October 28, 2011, the Company overdrafted one of its accounts with J.P. Morgan Chase & Co. MF Global transferred money from another account to compensate, but that transfer raised questions about whether MF Global had improperly used segregated customer funds from its FCM operations to cover the overdraft.[14] On October 29, 2011, MF Global discovered a shortfall in its customer funds account, but attributed the shortfall to an accounting error. However, by the early morning hours of October 31, 2011, MF Global instead informed regulators that the shortfall was accurate.

MF Global sought to sell off its assets to obtain the necessary liquidity. On October 30, 2011, the Company reached an agreement to sell its assets to another company, Interactive Brokers, for $1 billion. But that deal fell through when the customer funds shortfall came to light. MF Global declared bankruptcy on October 31. In the end, MF Global's FCM operations had a $1.6 billion shortfall in customer accounts—$900 million in domestic accounts and $700 million in foreign accounts.

---

**13.** At this meeting, Moody's also learned for the first time that the Company's RTM transactions were purely proprietary, rather than part of MF Global's client-facilitation business. Moody's Chief Credit Officer Richard Cantor later testified that this revelation reflected an "increased risk appetite" that was not accompanied by "a parallel increase in capital." (CAC ¶ 285.)

**14.** O'Brien, who executed the transfer at Corzine's direction, later invoked her Fifth Amendment privilege against self incrimination when she was subpoenaed to appear before a congressional subcommittee.

## C. *PROCEDURAL HISTORY*

On November 3, 2011, Joseph Deangelis brought the first action in this case. (Dkt. No. 1.) The Court has, as necessary, consolidated related actions under this docket. By Order dated January 20, 2012, the Court appointed The Virginia Retirement System and Her Majesty The Queen In Right Of Alberta as Lead Plaintiffs and approved the selection of Bernstein Litowitz Berger & Grossman LLP and Labaton Sucharow LLP as Co–Lead Counsel for all claims brought under the Exchange Act and the Securities Act.[15] (Dkt. No. 140.) Plaintiffs filed the CAC on August 20, 2012. These motions followed.[16]

## III. *LEGAL STANDARD*

Plaintiffs' fourteen-count CAC is divided into five sets of claims. Counts One and Two allege Exchange Act violations against the Officer Defendants; Count One alleges primary violations under Section 10(b) and Rule 10b–5, and Count Two alleges control person violations under Section 20(a).

Counts Three, Four, and Five bring Securities Act claims relating to the Secondary Notes. Count Three alleges Section 11(a) violations by the Individual Defendants and the Underwriter Defendants who underwrote the Secondary Notes. Count Four alleges violations of Section 12(a)(2) against those same Underwriter Defendants. Count Five alleges Section 15(a) control person violations by the Officer Defendants.

Counts Six, Seven, and Eight parallel Counts Three, Four, and Five with respect to the 2016 Notes; these counts allege Securities Act violations against the Individual Defendants and the Underwriter Defendants who underwrote the 2016 Notes.[17] Counts Nine, Ten, and Eleven similarly allege Securities Act Section 11, Section 12(a)(2), and Section 15(a) violations with respect to the 2018 Notes. Finally, Counts Twelve, Thirteen, and Fourteen bring parallel claims with respect to the Senior Notes; the Senior Notes Underwriters are defendants in Counts Twelve and Thirteen.

## A. *PLEADING STANDARDS: RULE 12(b)(6), RULE 8(a), RULE 9(b), AND THE PSLRA*

Rule 12(b)(6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S.

---

**15.** Pursuant to an April 24, 2012 order from the Panel on Multidistrict Legislation, separate but related actions for non-securities claims are proceeding under this docket.

**16.** On February 6, 2013, at the request of all parties, Magistrate Judge James C. Francis IV ordered a stay of all proceedings in this action while the parties engaged in voluntary media-

tion. (Dkt. No. 456.) Magistrate Judge Francis lifted the stay on September 12, 2013. (Dkt. No. 538.)

**17.** Sandler O'Neill & Partners, L.P., one of the Senior Notes Underwriters, is also a defendant in Counts Six and Seven.

at 555, 127 S.Ct. 1955. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y. 2005) (*quoting Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 101 (2d Cir.2003)) (internal quotation marks omitted), *aff'd sub nom., Tenney v. Credit Suisse First Boston Corp.*, Nos. 05–3430–CV, 05–4759–CV, 05–4760–CV, 2006 WL 1423785 (2d Cir. May 19, 2006). A court must accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *See Chambers*, 282 F.3d at 152.

Federal Rule of Civil Procedure 8(a) ("Rule 8(a)") requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Where Rule 8(a)'s pleading standard governs, dismissal is improper as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim and "relief could be granted under [some] set of facts consistent with the allegations." *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (alteration in original) (*quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)) (internal quotation marks omitted).

■ However, plaintiffs claiming securities fraud under the Exchange Act must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") by "stat[ing] with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.2007). Securities Acts claims that "are premised on allegations of fraud" also must satisfy Rule 9(b)'s partic-

ularity requirement. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.2004).

■ Exchange Act complaints must also meet the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *See Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

## B. THE EXCHANGE ACT

### 1. Section 10(b) and Rule 10b–5

In pertinent part, Section 10(b) declares it unlawful for any person, directly or indirectly, by the use of any means of interstate commerce, the mails, or a national securities exchange,

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

■ Rule 10b–5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999). Under Rule 10b–5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Section 10(b) operates as a broad prohibition against manipulation, whether in the form of false statements or market manipulation. *See United States v. Royer,* 549 F.3d 886, 900 (2d Cir.2008); *ATSI Commc'ns,* 493 F.3d at 99–100.

■■■ Plaintiffs in this case allege misrepresentations or omissions of material fact. To state a claim for misrepresentations or omissions, a plaintiff must allege that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns,* 493 F.3d at 105.[18]

### a. Misstatements or Omissions of Material Fact

■■■ In order to satisfy Rule 9(b) and PSLRA pleading requirements, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were 'fraudulent.'" *Id.* at 99. An omission is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993). Although "Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a 'duty to be both accurate and complete.'" *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 180 (S.D.N.Y.2010) (*quoting Caiola v. Citibank, N.A., N.Y.,* 295 F.3d 312, 331 (2d Cir.2002)).

### i. Materiality

■■■ Whether a misstatement or omission is material is "an inherently fact-specific finding that is satisfied when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Litwin v. Blackstone Grp. L.P.,* 634 F.3d 706, 716–17 (2d Cir.2011) (citations and internal quotation marks omitted); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Since materiality is a mixed question of law and fact, "a complaint may not properly be dismissed ... on the ground that the alleged misrepresentations or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 197 (2d Cir.2009) (alteration in original) (internal quotation marks omitted).

### ii. Bespeaks Caution and PSLRA Safe Harbor

■■■ Under the "bespeaks caution" doctrine, "[a] forward-looking statement

---

**18.** In their various motions to dismiss, no defendant in this action has argued that Plaintiffs have failed to adequately allege reliance and causation. Therefore, the Court will not address these elements any further.

accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 141 (2d Cir.2010); *see also Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) (applying bespeaks caution doctrine to Section 10(b) claim). The doctrine thus "is a corollary of 'the well-established principle that a statement or omission must be considered in context.'" *Iowa Pub. Emps.' Ret. Sys.,* 620 F.3d at 141 (*quoting In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 364 (3d Cir.1993)). Where sufficient cautionary statements about future risks are made, "it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Id.*

Vague disclosures of general risks will not protect defendants from liability. Instead, the relevant cautionary language must be "prominent and specific," and must directly address "exactly the risk that plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir.1996). Since most, if not all, securities offerings contain cautionary words, a district court must pay close attention to the question of whether the language provided matches the risk addressed. *See Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 359 (2d Cir.2002). Applying the bespeaks-caution doctrine requires a two-step analysis: (1) "identify the allegedly undisclosed risk"; and (2) "read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Id.; accord Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F.Supp.2d 210, 223 (S.D.N.Y.2008) (*citing Halperin,* 295

F.3d at 359); *In re FBR Inc. Sec. Litig.,* 544 F.Supp.2d 346, 361 (S.D.N.Y.2008) (same).

The bespeaks-caution doctrine applies only to forward-looking statements. *See Iowa Pub. Emps.' Ret. Sys.,* 620 F.3d at 142; *P. Stolz Family P'ship L.P. v. Daum,* 355 F.3d 92, 96–97 (2d Cir.2004). The doctrine does not apply where a statement "communicate[s] present or historical fact." *Iowa Pub. Emps.' Ret. Sys.,* 620 F.3d at 144; *see also Rombach,* 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). While "[a] statement may contain some elements that look forward and others that do not," a court should sever the statement's forward-looking elements from the non-forward-looking elements and apply the bespeaks-caution doctrine only to the former. *Iowa Pub. Emps.' Ret. Sys.,* 620 F.3d at 144.

The PSLRA contains a safe harbor provision that is "closely related" to the bespeaks caution doctrine. *In re General Elec. Co. Sec. Litig.,* 857 F.Supp.2d 367, 385 (S.D.N.Y.2012); *see also* 15 U.S.C. §§ 77z–2, 78u–5. Under the PSLRA safe harbor, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. American Express Co.,* 604 F.3d 758, 766 (2d Cir.2010). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 772. But the cautionary language itself also must not be misleading; "cautionary language that is misleading in light

of historical fact cannot be meaningful" under the statute. *Id.* at 770.

### iii. *Puffery*

 "Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *In re General Elec. Co.*, 857 F.Supp.2d at 384 (*citing ECA & Local 134*, 553 F.3d at 206). This rule permits companies "to operate with a hopeful outlook," as corporate officers "are not required to take a gloomy, fearful or defeatist view of the future." *Rombach*, 355 F.3d at 174 (internal quotation marks omitted). But statements are not puffery where they are "misrepresentations of existing facts" made even though the speaker "knew that the contrary was true." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (rejecting puffery argument where plaintiffs pled facts to show that statement "that the inventory situation was 'in good shape' or 'under control' " was not true); *see also In re Bank of Am. Corp. Sec., Derivatives, & ERISA Litig.*, 757 F.Supp.2d 260, 310 (S.D.N.Y.2010) ("[T]here is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.' " (*quoting Novak*, 216 F.3d at 315)).

### iv. *Misstatements of Opinion*

 In addition to misstatements or omissions of fact, statements of opinion or belief are also actionable under Section 10(b) and Rule 10b–5. *See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67–68 (2d Cir.2012) (adopting standard of *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir.2011), for Section 10(b) claims). To plead a claim for such statements, a plaintiff "must allege that [the] defendant's opinions were both

false and not honestly believed at the time they were made." *Fait*, 655 F.3d at 113 (*citing Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1095, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F.Supp.2d 479, 497, 2013 WL 3212297, at *13 (S.D.N.Y.2013) (dismissing complaint where "plaintiffs allege[d] no facts whatsoever to support their argument that defendants did not honestly believe their [opinion] when made"). The plaintiff must do more than merely assert that "the opinion reached by [the] defendant[ ] was unreasonable." *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835, 2011 WL 4357368, at *13 (S.D.N.Y. Sept. 19, 2011). Instead, the complaint must allege "provable facts to demonstrate that the statement of opinion is both objectively and subjectively false." *Podany v. Robertson Stephens, Inc.*, 318 F.Supp.2d 146, 154 (S.D.N.Y.2004) (internal quotation marks omitted).

### b. *Scienter*

 Scienter, "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (internal quotation marks omitted), is a required element of a claim under Section 10(b) and Rule 10b–5. In order to plead a "strong inference" of scienter, plaintiffs must allege with particularity either (a) "facts to show that the defendant had both motive and opportunity to commit fraud" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138 (internal quotation marks omitted).

 A complaint has sufficiently alleged "motive and opportunity to commit fraud" if it pleads facts showing that the

defendant "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08. "Motives that are common to most corporate officers ... do not constitute 'motive' for the purpose[ ]" of establishing scienter. *ECA & Local 134*, 553 F.3d at 198. Examples of general motives which fail to support a strong inference of scienter include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." *Kalnit*, 264 F.3d at 139. In order to plead opportunity, a plaintiff must "show that the individual defendants possessed 'the means and likely prospect of achieving concrete benefits by the means alleged.' " *In re Take–Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 297 (S.D.N.Y. 2008) (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer. *See, e.g., In re AstraZeneca Sec. Litig.*, 559 F.Supp.2d 453, 468 (S.D.N.Y.2008), *aff'd sub nom., State Univs. Ret. Sys. of Ill. v. AstraZeneca PLC*, 334 Fed.Appx. 404 (2d Cir.2009); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 181 (S.D.N.Y.2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

■■■■ Where plaintiffs fail to allege scienter through motive and opportunity, the securities fraud claim may still be sufficiently stated by allegations demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness," *Kalnit*, 264 F.3d at 138–39, but "the strength of the circumstantial allegations must be correspondingly greater," *id.* at 142 (internal quotation marks omitted).

A plaintiff pleading the conscious misbehavior or recklessness theory of scienter must allege conduct which is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (*quoting Honeyman v. Hoyt (In re Carter–Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir.2000)). Specifically, a complaint sufficiently pleads scienter where it alleges defendants had "knowledge of facts or access to information contradicting their public statements." *Id.* (*quoting Novak*, 216 F.3d at 308). Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308.

■■■■ Finally, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at ~~least as compelling as any opposing~~ inference of nonfraudulent intent." *Id.* at 314, 127 S.Ct. 2499.

2. *Section 20(a)*

■■■■ Section 20(a) of the Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled per-

son to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Liability for Section 20(a) violations thus is derivative of liability for Section 10(b) violations. *See Securities & Exchange Comm. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996). In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the defendant"; and (3) that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns,* 493 F.3d at 108 (internal citation omitted).

■■■ To establish the second element of control over the primary violator, a plaintiff must show that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2; *see also First Jersey,* 101 F.3d at 1472–73. "To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." *In re Global Crossing,* 2005 WL 1881514, at *12 (S.D.N.Y. Aug. 5, 2005) (internal quotation marks omitted); *see also Cohen v. Stevanovich,* 722 F.Supp.2d 416, 435 (S.D.N.Y.2010). Moreover, a Section 20(a) defendant "must not only have actual control over the primary violator, but have 'actual control over the *transaction* in question.'" *In re Alstom SA (Alstom III),* 406 F.Supp.2d 433, 487 (S.D.N.Y.2005) (*quoting In re Global Crossing,* 2005 WL 1875445, at *12 (S.D.N.Y. Aug. 5, 2005));

*see also Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 372, 425 (S.D.N.Y. 2010).

■■■ Because fraud is not an essential element of a Section 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b). *See In re Bristol Myers Squibb Co. Sec. Litig.,* 586 F.Supp.2d 148, 170–71 (S.D.N.Y.2008); *Hall v. The Children's Place Retail Stores, Inc.,* 580 F.Supp.2d 212, 235 (S.D.N.Y.2008). Instead, control may be pled in accordance with the notice pleading standard prescribed in Rule 8(a). *See In re Alstom SA (Alstom IV),* 454 F.Supp.2d 187, 210 (S.D.N.Y.2006). "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *Katz v. Image Innovations Holdings, Inc.,* 542 F.Supp.2d 269, 276 (S.D.N.Y.2008) (internal quotation marks omitted).

■■■ However, the heightened pleading standards of the PSLRA apply with respect to the third prong of a Section 20(a) claim, which requires plaintiffs to allege facts demonstrating that the defendant was a culpable participant. *See Alstom III,* 406 F.Supp.2d at 491. In order to plead culpable participation, a plaintiff must plead with particularity "facts giving rise to a strong inference that the defendant acted with the requisite state of mind," *i.e.,* scienter. *Id.; see also In re Global Crossing,* 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (requiring that § 20(a) plaintiffs allege with particularity that the controlling person "knew or should have known" that the primary violator was engaging in fraudulent conduct). In order to withstand a motion to dismiss, a Section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness. *See In re Livent, Inc. Note-*

*holders Sec. Litig.*, 151 F.Supp.2d 371, 414–17 (S.D.N.Y.2001) ("[R]ecklessness is the appropriate minimum standard of culpability that plaintiffs must plead under [Section] 20(a)."); *Cohen,* 722 F.Supp.2d at 435.

## C. THE SECURITIES ACT

### 1. Section 11 and Section 12(a)(2)

█ Section 11 imposes liability on issuers, directors of issuers, and other signers of a registration statement that contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading. *See* 15 U.S.C. § 77k(a). Section 12(a)(2) similarly imposes liability for selling or offering a security by means of a prospectus that includes an untrue statement of material fact or omits a material fact necessary to make such statements not misleading. *See* 15 U.S.C. § 77*l*(a)(2). Under either section, "a plaintiff must show that the relevant communication either misstated or omitted a material fact." *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141. The two provisions "have roughly parallel elements," *Fait,* 655 F.3d at 109 (internal quotation marks omitted), such that "[a] plaintiff who fails to plead a [Section] 11 claim necessarily fails to plead a [Section] 12(a)(2) claim as well," *In re Agria Corp. Sec. Litig.*, 672 F.Supp.2d 520, 525 (S.D.N.Y.2009) (internal quotation marks omitted).

█ The Court notes that its previous discussion about misstatements or omissions of material facts with respect to Exchange Act claims applies equally to Securities Act claims, *see In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir.2010), except that Securities Act claims do not need to be pled with particularity unless they sound in fraud, *see Rombach,* 355 F.3d at 171. Moreover, unlike claims under the Exchange Act,

claims under the Securities Act "do not require allegations of scienter, reliance, or loss causation." *Fait,* 655 F.3d at 109. Instead, Section 11 imposes " 'virtually absolute' " liability on issuers, and Section 11 and Section 12(a)(2) impose liability on other parties "for mere negligence." *In re Morgan Stanley,* 592 F.3d at 359 (*quoting Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

### 2. Section 15(a)

Section 15(a) of the Securities Act provides that a person who controls a person liable under Section 11 or Section 12

> shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*(a). The provision thus requires proof of "a 'primary violation' " of the statute "and control of the primary violator by defendants." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir.2011) (*quoting ECA & Local 134,* 553 F.3d at 207). "Control" for the purposes of Section 15(a) of the Securities Act is the same as "control" under Section 20(b) of the Exchange Act. *Id.* at 185–86; *see also First Jersey,* 101 F.3d at 1472–73.

█ The Second Circuit has reserved decision on whether the proof of "culpable participation" required in Section 20(a) claims also applies to Section 15(a) claims. *In re Lehman Bros.,* 650 F.3d at 186. However, "a majority of judges in this District . . . have held such an allegation is not required." *In re Bear Stearns Mortg.*

*Pass–Through Certificates Litig.*, 851 F.Supp.2d 746, 773 (S.D.N.Y.2012) (collecting cases).

## IV. *DISCUSSION*

### A. *PLEADING STANDARDS*

#### 1. *Exchange Act Claims*

Corzine alleges that Counts One and Two should be dismissed for failure to meet the requirements of Rule 8(a), Rule 9(b), and the PSLRA. According to Corzine, the CAC is not "simple, concise, and direct." (Corzine's Motion, p. 3.)[19] Corzine also claims that the CAC does not adequately identify "which of the alleged misstatements are meant to correspond to which of the alleged reasons for the falsity of the alleged misstatements." (*Id.*)

The CAC separates its list of alleged misstatements into statements made in each fiscal quarter from the fourth quarter of fiscal year 2010 to the second quarter of fiscal year 2012. Within the section for each fiscal quarter, the CAC separates out the statements made with respect to MF Global's DTA and net income and the statements made with respect to MF Global's risk appetite, internal controls, and liquidity management. Then, each subsection lists the various alleged misstatements or omissions during that time period and category. Each allegation contains the statement's source and, where appropriate, highlights through bold text the particular parts of the statement alleged to be inadequate. Finally, each subsection concludes with a paragraph containing reasons why the preceding statements were false or misleading.

The Court finds that the CAC satisfies the particularity requirements of Rule 9(b) and the PSLRA. The CAC "specifically identif[ies] the date, publication and speaker of each of the alleged misstatements or omissions" and "contain[s] facts supporting the existence and materiality of these problems." *In re NTL, Inc. Sec. Litig.*, 347 F.Supp.2d 15, 22–23 (S.D.N.Y.2004) (footnote omitted). The CAC's use of bold text to highlight particular aspects of the statements alleged to be misleading further supports a finding of sufficient particularity. *Cf. In re ITT Educ. Servs., Inc. Sec. & Shareholder Derivatives Litig.*, 859 F.Supp.2d 572, 578 (S.D.N.Y.2012) (faulting complaint for highlighting "more than half" of statements quoted "while simultaneously-conceding that it is not challenging many of the statements it has chosen to highlight"); *In re Alcatel Sec. Litig.*, 382 F.Supp.2d 513, 534 (S.D.N.Y.2005) (faulting complaint for "neglect[ing] to make it clear what portion of each quotation constitutes a false representation"). The CAC is thus not a complaint that is so "[v]ague and disorganized" as to fail to satisfy Rule 9(b) and the PSLRA. *In re ITT Educ. Servs.*, 859 F.Supp.2d at 578.

The Court also acknowledges that, in some respects, Plaintiffs are stuck between the proverbial rock of Rule 8(a) and the proverbial hard place of Rule 9(b) and the PSLRA. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1156 (C.D.Cal.2008) (recognizing that "navigating and reconciling" Rule 8(a), Rule 9(b), and the PLSRA creates "an onerous task" for securities fraud plaintiffs). Corzine seeks to take advantage of Plaintiffs' predicament by claiming both that the complaint is too detailed (and thus fails Rule

---

19. The Court notes that, to avoid unnecessary duplication, Defendants have adopted each others' arguments where appropriate. The Court identifies arguments only by the party or parties who briefed the argument, without intending to preclude other defendants from preserving those arguments to the extent they apply to those defendants.

8(a)) and that it is not detailed enough (and thus fails Rule 9(b) and the PLSRA). But in cases like this one, with particularly complex facts, some flexibility is warranted. *See In re New Century*, 588 F.Supp.2d 1206, 1219 (C.D.Cal.2008) ("The plaintiff has the responsibility to craft a clear and concise complaint, but the allegations that discharge this responsibility will depend on the type of action, the specific facts, the number of parties, and other variables.").

The Court is convinced that the CAC sufficiently achieves the goals embodied within Rule 8(a), Rule 9(b), and the PLSRA, which are "to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns*, 493 F.3d at 99. Indeed, Defendants' briefs in support of their motions to dismiss, which forcefully and directly attack Plaintiffs' allegations of wrongdoing, are themselves proof that Defendants have notice of the claims against them. *See Stephenson v. Deutsche Bank AG*, 282 F.Supp.2d 1032, 1075 (D.Minn.2003) (relying on the defendants' motions to dismiss to find that complaint "effectively alerted Defendants of the claims against them"). Corzine is correct that the CAC *could* state more particularly which of the reasons the statements are alleged to be false applies to which of the allegedly false statements. But imposing that requirement on Plaintiffs would serve no valid purpose, and Rule 9(b) and the PSLRA do not require such an extreme level of particularity. The Court thus finds that Plaintiffs have complied with the various pleading standards applicable their Exchange Act claims.

### 2. *Securities Act Claims*

While Exchange Act claims require proof of fraud and must always be pled with particularity, Securities Act claims must be pled with particularity only where "the gravamen of the complaint is plainly fraud." *Rombach*, 355 F.3d at 172. Plaintiffs attempt to distinguish their Securities Act claims from their Exchange Act claims. The CAC states that, with respect to the Securities Act claims, "Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims." (CAC ¶ 532.) At the same time, Plaintiffs include a disclaimer: that "any challenged statements of opinion or belief" for which Defendants are liable under the Securities Act "are alleged to have been materially misstated statements of opinion or belief when made." (*Id.*) Plaintiffs' disclaimer is made in an effort to comply with the Second Circuit's decisions in *Fait v. Regions Financial Corp.*, which held that statements of opinion are not actionable under the Securities Act unless those opinions "were both false and not honestly believed at the time they were made." 655 F.3d at 113.

 The Independent Director Defendants seize on this disclaimer to argue that the Securities Act claims do, in fact, sound in fraud and must be pled with particularity. (Independent Directors' Motion, p. 9–10.) The Independent Directors suggest that Plaintiffs' claim that any opinions were false when made turns the Securities Act claims into claims requiring proof of fraud, which in turn requires Plaintiffs to plead those claims with particularity under Rule 9(b). *See In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714, 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 10, 2012) (finding that complaint cannot both disclaim allegations of fraud and also allege that defendants subjectively disbelieved their opinions when made). But the Second Circuit's recent decision in *Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir.2013), directly undercuts the Indepen-

dent Directors' argument.[20] There, the Second Circuit found that "the district court erred in stating that claims of disbelief of subjective opinions must necessarily be brought as fraud claims." *Id.* at 141. To the contrary, to require proof that an opinion was subjectively disbelieved does not also require proof of fraudulent intent. *Id.; see also Fait,* 655 F.3d at 112 n. 5 ("We do not view a requirement that a plaintiff plausibly allege that defendant misstated his truly held belief and an allegation that defendant did so with fraudulent intent as one and the same."). It is thus clear that Plaintiffs are correct to say that a complaint can plead that opinions were subjectively disbelieved when made while not also sounding in fraud.

In the alternative, the Independent Directors argue (Independent Directors' Motion, p. 10) that the CAC does not sufficiently separate its Exchange Act claims (which do allege fraud) from its Securities Act claims (which purport not to allege fraud). *Compare In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* No. 03 MD 1529, 2007 WL 2615928, at *9 (S.D.N.Y. Sept. 10, 2007) (finding that Securities Act claims sounded in fraud because complaint relied on same accusations of fraud for both Securities Act and Exchange Act claims), *with In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 613 (S.D.N.Y.2007) (finding that complaint "specifically pled alternate theories of fraud and negligence"). But the Court need not decide whether Plaintiffs' CAC sufficiently accomplishes the goal of separating its fraud-based Exchange Act claims from its non-fraud-based Securities Act claims. Even if the Independent Director Defendants are correct that the

CAC's Securities Act claims sound in fraud, Plaintiffs have met Rule 9(b) particularity standard for the reasons described above. The Court finds that Plaintiffs have complied with all pleading standards applicable to their Securities Act claims.

## B. *MATERIAL MISSTATEMENTS OR OMISSIONS*

### 1. *DTA and Net Income*

Plaintiffs allege that MF Global's public statements contained false or misleading statements or omissions about MF Global's DTA and net income because "the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP." (CAC ¶¶ 324, 342, 357, 374, 393, 421.) Plaintiffs claim that the valuation allowance should have been taken earlier because

(1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially

---

**20.** Indeed, the Independent Directors rely strongly on the district court opinion that *Freidus* reversed. (*See* Independent Directors' Motion, p. 10 (citing *In re Barclays* *Bank PLC Sec. Litig.,* No. 09 Civ.1989, 2011 WL 2150477, at *3 (S.D.N.Y. May 31, 2011), *rev'd, Freidus,* 734 F.3d 132).)

offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

(CAC ¶¶ 324, 342, 357, 374, 393, 421.) Defendants claim that the statements made about DTA were not materially false or misleading and raise various arguments in support. The Court addresses these arguments in turn.

### a. *Whether the Statements about DTA Are Opinion*

█ At the threshold, the Court must determine whether the statements made about MF Global's DTA were statements of opinion, as the Underwriters and Senior Notes Underwriters (joined by the other defendants) claim. (Underwriters' Motion, p. 17–19; Senior Notes Underwriters' Motion, p. 21.) If those statements are opinions, then they are actionable only if they "were both false and not honestly believed at the time they were made." *Fait,* 655 F.3d at 113.[21]

While *Fait* explained the circumstances under which an opinion can be actionable, it did not comprehensively delineate the difference between a statement of opinion and a statement of fact. At issue in *Fait* was whether statements about the value of a company's "goodwill" constituted fact or opinion. *See id.* at 110. The Second Circuit noted that the value of the company's goodwill depended on a "determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Id.* The court also observed that the plaintiff did not identify an "objective standard" that the defendant

"should have but failed to use in determining the value of" the company's goodwill. *Id.* The Second Circuit concluded that "the statements regarding goodwill at issue here are subjective ones rather than 'objective factual matters.'" *Id.* at 111 (*quoting I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991)).

*Fait* also considered whether statements about the company's reserves to cover for potentially lost loans constituted statements of fact or opinion. *See id.* at 112–13. The Second Circuit noted that determinations of loan loss reserves, like determinations of goodwill, "reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." *Id.* at 113. And the court noted that plaintiff again failed to identify "an objective standard for setting loan loss reserves." *Id.* Thus, the court ruled that statements about loan loss reserves are opinions, rather than statements of facts. *Id.*

█ The Court finds that, under *Fait*'s reasoning, statements about the realization of DTA are statements of opinion, not of fact. The GAAP standard on which Plaintiffs rely required MF Global's management to weigh the available evidence and determine whether the DTA was "more likely than not to be realized." (CAC ¶ 91.) Determining whether to take a valuation allowance against DTA is thus subject to "a very subjective standard." *In re Fannie Mae 2008 Sec. Litig.,* 742 F.Supp.2d 382, 409 (S.D.N.Y.2010); *see also Kuriakose v. Federal Home Loan Mortg. Corp.,* 897 F.Supp.2d 168, 181 (S.D.N.Y.2012) (noting that the "'more likely than not'" standard for writing

---

**21.** Statements of opinion are also actionable when "stated as guarantees." *Fait,* 655 F.3d at 110 n. 3. Plaintiffs do not argue that MF Global's statements about realizing its DTA constituted guarantees.

down DTA is "nebulous"); *Limantour v. Cray Inc.*, 432 F.Supp.2d 1129, 1156 (W.D.Wash.2006) (calling determination to take valuation allowance against DTA "a judgment call based on all available positive and negative evidence"). Determining the value of a company's DTA, like determining the value of goodwill, does not involve "matters of objective fact." *Fait*, 655 F.3d at 110.

Plaintiffs' arguments to the contrary (Plaintiffs' Opposition, p. 12–15) are unpersuasive. While Plaintiffs are correct that the GAAP standard references the presence of "objectively verified" evidence (CAC ¶ 97), the reference relates only to one factor that affects the subjective weighing of positive and negative evidence. The final decision of whether to take a valuation allowance against DTA still requires substantially subjective judgments. *Cf. Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) ("A Moody's credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors."). Plaintiffs have not identified an objective standard that should have been applied. *See Fait*, 655 F.3d at 110, 113. Moreover, contrary to Plaintiffs' argument, this case is not one in which the complaint alleges that a company "engaged in improper accounting practices." *In re General Elec. Co.*, 856 F.Supp.2d 645, 658 n. 2 (S.D.N.Y.2012). This case is not about whether MF Global failed to apply the proper accounting practice, but instead is about whether the applicable accounting practice was applied correctly. Since in this case the applicable accounting practice involves "estimates of subjective values," *Fait*'s standard applies. *Id.*

b. *Whether the CAC Pleads Subjective and Objective Falsity*

 Because the Court concludes that MF Global's statements about its DTA

were opinions, it must next determine whether the statements "were both false and not honestly believed at the time they were made." *Fait*, 655 F.3d at 113. The Court finds that Plaintiffs have pled sufficient facts to meet this standard.

First, the Court finds that Plaintiffs plausibly allege that MF Global's statements about its DTA were objectively false. Most significantly, MF Global's United States operations were in a three-year loss position at the start of the Class Period, which served as significant negative evidence against recognizing the DTA. *See Hoff v. Popular, Inc.*, 727 F.Supp.2d 77, 90 (D.P.R.2010) (recognizing three-year loss position as "strong evidence that at the beginning of the class period it was more likely than not that the Company would not be able to realize" DTA); *In re Scottish Re Grp. Sec. Litig.*, 524 F.Supp.2d 370, 389–90 (S.D.N.Y.2007) (same). Despite this, MF Global did not acknowledge its loss position as negative evidence until its 2011 Form 10–K. Disclosures made prior to the 2011 Form 10–K also failed to explain the positive evidence on which the Company relied to avoid taking a valuation allowance against its DTA.

The CAC further alleges weaknesses in the positive evidence that MF Global used to justify its DTA position. According to the CAC, MF Global's projections of increased income based on the RTM Strategy could not serve as sufficient positive evidence because it was high-risk and unsustainable. *See Hoff*, 727 F.Supp.2d at 90 ("Popular U.S. did not have a strong earnings history, nor would it have been reasonable for Popular to interpret that the historical losses in its U.S. operations were an aberration or anything but a continuing condition."). The CAC also explains why MF Global's changes in compensation structure and tax planning strategies could

not overcome its existing three-year loss position.

Finally, the fact that MF Global took some small valuation allowances against its DTA during the Class Period makes it more plausible that the Company's failure to take an allowance against the full value of its DTA was materially misleading. *See In re Scottish Re*, 524 F.Supp.2d at 390 (noting that company's small valuation allowances "may have further misled investors to believe that the Company was properly reporting and evaluating its deferred tax assets and taking valuation allowances when needed"). Indeed, MacDonald went so far as to aver that the remainder of the DTA was not as at risk, thus amplifying the misleading nature of the valuation allowances. In sum, the allegations in the CAC, taken as a whole, give rise to a reasonable inference that MF Global made material misstatements with respect to its DTA.

To be sure, some courts have dismissed securities fraud complaints that were based on a company's failure to take a timely valuation allowance against its DTA. But in those cases, the facts pled did not support a plausible claim of falsity. *See Kuriakose*, 897 F.Supp.2d at 181 ("Plaintiffs have alleged no specific facts from which the Court can conclude that Freddie Mac anticipated that it would not have any taxable income."); *In re Fannie Mae*, 742 F.Supp.2d at 409 (company was not in three-year loss position prior to

recording DTA); *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1162 (C.D.Cal. 2007) ("Plaintiffs do not allege any facts showing that the conclusion [that a valuation allowance should not be taken] ... was improperly made...."); *Limantour*, 432 F.Supp.2d at 1157 (company reported profit in year prior to recording DTA). Here, by contrast, the CAC sufficiently alleges objective falsity.

The Court also finds that the CAC plausibly alleges that the Officer Defendants did not honestly believe their stated opinions.[22] According to the CAC, the Officers (1) were aware of the relevant GAAP accounting standard and (2) knew that the positive evidence on which they relied would not be sufficient for MF Global to realize its DTA. *See Hoff*, 727 F.Supp.2d at 93 (finding such knowledge sufficient to raise a strong inference of scienter); *In re Scottish Re*, 524 F.Supp.2d at 393–94 (same).[23] From there, Plaintiffs are entitled to a reasonable inference that the Officers subjectively believed that MF Global should take a valuation allowance against its DTA, despite their public statements to the contrary. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F.Supp.2d 155, 178–79 (S.D.N.Y.2009) (finding knowledge of contrary information sufficient to plead subjective falsity of opinion); *cf. In re Deutsche Bank AG*, 2012 WL 3297730, at *2 (rejecting claim of subjective falsity where plaintiffs "specifically aver[red] that

---

**22.** The Court agrees with Plaintiffs (Plaintiffs' Opposition, p. 12 n. 12) that the CAC must only allege subjective falsity as to the Officers, who are "the originator[s] of the opinions expressed in the offering documents." *Federal Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F.Supp.2d 306, 327 (S.D.N.Y.2012), *aff'd*, 712 F.3d 136 (2d Cir.2013). The Independent Directors are incorrect when they allege (Independent Directors' Motion, p. 14; Independent Directors' Reply, p. 4 n. 6) that the CAC

must allege subjective falsity as to them. *See UBS Ams., Inc.*, 858 F.Supp.2d at 326 ("The Securities Act does not require a defendant-specific showing of subjective falsity in order to impose liability for opinion statements ....").

**23.** If such knowledge is sufficient to plead fraudulent intent, then it necessarily must be sufficient to plead mere subjective falsity. *See Podany*, 318 F.Supp.2d at 154.

none of their claims [were] based on knowing misconduct"). The allegations thus go beyond claiming merely that the opinion was "unreasonable" or that it was "possible to reach a different opinion ... based on the information available to [the Officers] at the time." *Podany*, 318 F.Supp.2d at 154. Rather, it can be "plausibly inferred" from the facts alleged that the Officers "knew they were disseminating false and misleading" opinions about MF Global's DTA. *Abu Dhabi Commercial Bank*, 651 F.Supp.2d at 179.

Of course, a person's mere knowledge of facts that cut against his opinion does not conclusively prove subjective falsity. But at this stage of the proceedings, Plaintiffs need only allege facts giving rise to a reasonable inference of liability. The Court finds that Plaintiffs plausibly allege subjective falsity; a fact finder can later determine whether the evidence sufficiently proves subjective falsity. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F.Supp.2d 431, 456–57 (S.D.N.Y.2012) (denying summary judgment because "plaintiffs have offered sufficient evidence from which a jury could infer" objective and subjective falsity).

### c. *Bespeaks Caution*

The Securities Act Defendants claim that the bespeaks-caution doctrine precludes liability for statements made about MF Global's DTA. (Underwriters' Motion, p. 22–24; Senior Notes Underwriters' Motion, p. 23–24; Securities Act Defendants' Reply, p. 15–16.) They point to various disclosures the Company made in which it warned investors that it might not return to profitability, that its cost-saving strategies might not be successful, and that it consequently might not realize its DTA. ▇ The Court is not persuaded that these disclosures preclude the alleged misstatements from being material as a mat-

ter of law. Rather, the language highlighted by the Securities Act Defendants is "merely a boilerplate litany of generally applicable risk factors." *Slayton*, 604 F.3d at 772 (*quoting Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir.2004)). The disclosures refer *generally* to potential unexpected events or contingencies that *might* have prevented MF Global from realizing the full value of its DTA. But the CAC alleges *specific* information, known to the Officers, which Plaintiffs assert made the Officers' opinion that MF Global did not need to take a valuation allowance against its DTA subjectively false. The general statements of risk that accompanied MF Global's public disclosure were not sufficient to make those allegedly false opinions immaterial as a matter of law. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F.Supp.2d 359, 365 (S.D.N.Y. 2012) (finding cautionary language insufficient where it did not "speak[ ] to the substantive information that plaintiff alleges the defendants misrepresented"); *In re American Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 532 (S.D.N.Y.2010) (finding cautionary language insufficient "in light of the undisclosed hard facts critical to appreciating the magnitude of the risks described" (internal quotation marks omitted)).

The disclosures did not specifically reveal the particular risks allegedly known to MF Global and the Officers. *See Slayton*, 604 F.3d at 772 (noting that cautionary language is insufficient where it did not "convey[ ] substantive information" about the risk at issue). MF Global's cautionary language thus fell short of the more specific qualifications that courts have found sufficient under the bespeaks-caution doctrine. *See, e.g., P. Stolz Family P'ship*, 355 F.3d at 98 (granting motion to dismiss where offering documents "cau-

tion[ed] prospective investors that future financing was tenuous" and that they could suffer complete loss of investment); *Olkey*, 98 F.3d at 5–6 (granting motion to dismiss where prospectuses specifically warned that changes in interest rates could affect return on investment); *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *17 (S.D.N.Y. Jan. 26, 2009) (granting motion to dismiss where registration statement and prospectus warned that they gave " 'preliminary' estimates that were 'inherently difficult to predict' " and "were subject to a 'high level of uncertainty,' " which consequently could affect company's financial condition).

### 2. *RTM Strategy*

Plaintiffs allege material misstatements and omissions with respect to MF Global's "risk appetite, internal controls and liquidity management" because

(1) the Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with in-

vestments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations. (CAC ¶¶ 336, 354, 370, 386, 416, 443, 459.) Again, Defendants make various arguments to claim that the statements about the RTM Strategy were not materially false or misleading. The Court addresses these arguments in turn.

### a. *False or Misleading Statements*

Defendants suggest that the alleged misstatements were in fact not misstatements at all. Rather, according to Defendants, MF Global fully disclosed the nature of and risks associated with the RTM Strategy, including the capital, liquidity, and risk management weaknesses that are the focus of the CAC. Plaintiffs respond by highlighting particular disclosures and omissions that they claim to have materially misled investors. The Court finds that CAC sufficiently pleads materially false or misleading statements to plausibly allege that Defendants have committed Securities Act and Exchange Act violations.

First, the CAC pleads actionable misstatements with respect to MF Global's assurances that the Company operated within specified risk limits. Plaintiffs allege that, contrary to those assurances, Corzine and MF Global repeatedly breached the limits set on investments in European sovereign debt. Under those circumstances, Plaintiffs have alleged material misstatements. *See In re Lehman Bros. Sec. & Erisa Litig.*, 799 F.Supp.2d 258, 284–85 (S.D.N.Y.2011) (finding similar statement actionable in light of allegations that company "routinely exceeded various risk limits it had created"). Contrary to

Defendants' claims, that the Board later increased the trading limits does not refute a reasonable inference that the original statement materially misled investors. *See id.* at 285 (noting that later increase in previously breached limits "is at best in considerable tension with" claim that company adhered to limits).

Second, Plaintiffs plead actionable misstatements about MF Global's risk controls. MF Global's public filings and statements described the Company's internal controls as, among other things, "robust" (CAC ¶ 331), "effective" (*id.*), "adequate" (CAC ¶ 362), and "comprehensive" and "designed to monitor, evaluate, and manage the risks [MF Global] assume[d]" (CAC ¶ 402). The CAC pleads contrary information from MF Global's IAD that undermines the accuracy of those disclosures. For example, the IAD's reports to the Board reveal numerous weaknesses that undermine the accuracy of MF Global's public disclosures. *See Cornwell v. Credit Suisse Grp.,* 689 F.Supp.2d 629, 638 (S.D.N.Y.2010) (noting that disclosures stating that internal controls and risk management mitigated risk are actionable where defendants have information to the contrary). Plaintiffs have thus plausibly alleged material misstatements. *See In re Lehman Bros.,* 799 F.Supp.2d at 285 (finding actionable statements of company's confidence in risk controls); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,* 763 F.Supp.2d 423, 494 (S.D.N.Y.2011) (same); *In re American Int'l Grp.,* 741 F.Supp.2d at 530 (same).

Third, Plaintiffs plead actionable misstatements with respect to the risks posed by the RTM Strategy. MF Global's public statements consistently denied that the RTM Strategy posed a substantial risk to the Company. Among other disclosures, the Officers referred to the risk as "minimal" (CAC ¶¶ 399, 424) and "limited" (CAC ¶ 447), and Corzine told investors that the RTM Strategy "actually makes [MF Global] less risky" (CAC ¶ 422). The CAC simultaneously alleges that the RTM Strategy exposed MF Global to substantial risk and ultimately contributed to the Company's collapse. Plaintiffs have thus alleged facts giving rise to a reasonable inference that the statements made about the RTM Strategy's risks were material misstatements.

While Defendants argue that the CAC merely pleads inactionable fraud by hindsight, *see Slayton,* 604 F.3d at 776, the contemporaneous response to MF Global's disclosure of its risk exposure—prior to the Company's collapse—undermines this claim. As described above, when MF Global disclosed its exposure to European sovereign debt, FINRA and the SEC took action to force MF Global to increase its capital reserves. Moody's also reacted negatively to MF Global's revelation that the RTM transactions were proprietary, rather than client-driven.[24] These reactions buttress a reasonable inference that MF Global's statements would have materially misled a reasonable investor. *See Litwin,* 634 F.3d at 716–17. In addition, the CAC's allegations survive a fraud-by-hindsight objection because Plaintiffs "have sufficiently pled that Defendants had present knowledge of the risk" that was not disclosed. *Freudenberg v. E*Trade Fin. Corp.,* 712 F.Supp.2d 171, 192 (S.D.N.Y.2010).

Finally, the CAC pleads actionable misstatements about MF Global's capital and liquidity management. While MF Global and the Officers repeatedly represented

---

**24.** The Officer Defendants characterize Moody's reaction as confusing and incoherent. (Officers' Reply, p. 2.) But that does nothing more than to raise a question of fact as to whether MF Global's previous disclosures were inadequate.

that the Company had a "strong" liquidity position (*see, e.g.,* CAC ¶ 334, 346, 348, 378, 445, 447), Plaintiffs allege that MF Global faced substantial strain on its capital and liquidity and met its requirements only through daily intra-company transfers, and collapsed when RTM counterparties demanded additional margin. These facts plausibly allege material misstatements under the Exchange Act and the Securities Act.[25]

■ Defendants argue that the claimed misstatements were mere puffery and emphasize that MF Global was "not required to take a gloomy, fearful or defeatist view of the future." *Rombach,* 355 F.3d at 174. The Court is persuaded, for the reasons described above, that the CAC pleads "misrepresentations of existing fact" that are not puffery. *Novak,* 216 F.3d at 315; *see Freudenberg,* 712 F.Supp.2d at 190 (rejecting puffery defense where "[d]efendants denied that E*TRADE's real estate loan portfolio had become more risky—even though it is alleged that the risks had increased"). Put another way Plaintiffs' pleading survives an objection that the alleged misstatements were "so vague, broad, and non-specific that a reasonable investor would not rely on [them]." *In re General Elec. Co.,* 857 F.Supp.2d at 384.

b. *Bespeaks Caution / PSLRA Safe Harbor*

Defendants suggest that the Company's alleged misstatements concerning the RTM Strategy are protected by the bespeaks-caution doctrine and the PSLRA safe harbor for forward-looking state-

ments. They point to disclosures that the Company might increase trading risk, or might not hold sufficient capital or liquidity to meet market demands, as statements that contain "sufficient cautionary language" to defeat any claim of materiality. *Iowa Pub. Emps.' Ret. Sys.,* 620 F.3d at 141.

■ The Court rejects this argument for reasons similar to those stated in the above analysis of the DTA statements: the CAC alleges specific information, known to the Officers, which made their disclosures about the risks of the RTM Strategy subjectively false. The Company's public filings and statements were thus insufficient "in light of the undisclosed hard facts critical to appreciating the magnitude of the risks described." *In re American Int'l Grp., Inc.,* 741 F.Supp.2d at 532 (internal quotation marks omitted). By superficially warning of possible risks while failing to disclose critical facts, MF Global was akin "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996). The disclosures thus do not fall under the bespeaks-caution doctrine, *see id.,* or the PSLRA safe harbor, *see Slayton,* 604 F.3d at 770 ("[C]autionary language that is misleading in light of historical fact cannot be meaningful.").

In sum, the Court finds that the CAC sufficiently pleads facts that plausibly allege material misstatements to survive dismissal at this stage.[26]

---

25. To the extent any of the statements described in this section constitute opinions, the CAC sufficiently pleads the speaker's knowledge of contrary information to give rise to a reasonable inference of subjective falsity. *See Abu Dhabi Commercial Bank,* 651 F.Supp.2d at 178–79.

26. The parties dispute exactly which of the many alleged misstatements in the CAC are sufficient to give rise to Exchange Act and Securities Act liability. The Court sees no need to resolve those disputes at this time; because the CAC pleads at least some misstatements sufficient to survive dismissal, "the

## C. *EXCHANGE ACT DEFENSES*

The Officer Defendants raise several arguments specific to the Exchange Act claims brought against them. The Court addresses these arguments in turn.

### 1. *Strong Inference of Scienter*

To state a claim under the Exchange Act, Plaintiffs must plead facts that "give rise to a strong inference of fraudulent intent." *Kalnit,* 264 F.3d at 138 (*quoting Novak,* 216 F.3d at 307). While Plaintiffs do not plead facts to show that the Officers had special motives to act fraudulently, that is not fatal to their claim. *See Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499 (noting that "the absence of a motive allegation is not fatal" to a claim of fraudulent intent). Plaintiffs instead claim (Plaintiffs' Opposition, p. 47–58) that the CAC demonstrates "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit,* 264 F.3d at 138. However, absent motive, "the strength of the circumstantial allegations [demonstrating conscious misbehavior or recklessness] must be correspondingly greater." *Id.* at 142 (citation and internal quotation mark omitted). The Officer Defendants counter that the CAC does not sufficiently plead scienter. (Corzine's Motion, p. 16–24; MacDonald's Motion, p. 9–16; Steenkamp's Motion, p. 13–19; Officers' Reply, p. 12–16.)

▮▮▮▮▮ The Court finds that Plaintiffs have adequately pled scienter as to each of the Officer Defendants.[27] First, with respect to statements made about MF Glob-

al's DTA, Plaintiffs plead either knowledge of or failure by each of the Officer Defendants to conduct a sufficient investigation into facts that would contradict the Officers' public statements. *See Novak,* 216 F.3d at 308. Each of the Officers demonstrated awareness of the GAAP standards for recognizing DTAs either through public statements or by signing MF Global's public filings that claimed compliance with the standards. *See In re Scottish Re,* 524 F.Supp.2d at 393 (finding sufficient proof of knowledge of GAAP's DTA standards where defendants "applied and quoted the standard in the Company's financial statements both before and throughout the Class Period"). Those signatures created for the Officers "a 'duty to familiarize themselves with the facts relevant to the core operations of [MF Global].'" *See Alstom III,* 406 F.Supp.2d at 459 (*quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 05 Civ. 1898, 2005 WL 2148919, at *63 (S.D.N.Y. Sept. 6, 2005)). The CAC also pleads facts sufficient to demonstrate strong circumstantial evidence that, in light of the weaknesses in the positive evidence on which MF Global relied to avoid taking a valuation allowance against its DTA, the failure to take that valuation allowance was reckless. *See Hoff,* 727 F.Supp.2d at 93 (finding sufficient evidence of scienter for failure to take valuation allowance against DTA "to the extent that the danger was either known to the defendants or so obvious that they must have been aware of it").

---

Court can evaluate the exact parameters of those claims following discovery, either in connection with a motion for summary judgment or in advance of trial." *Citiline Holdings, Inc. v. iStar Fin. Inc.,* 701 F.Supp.2d 506, 515 n. 2 (S.D.N.Y.2010).

27. The Court thus rejects the MacDonald's claim (MacDonald's Motion, p. 12–13; Mac-

Donald's Reply, p. 1) that the CAC's scienter allegations are improper group pleading. *See In re CRM Holdings, Ltd. Sec. Litig.,* No. 10 Civ. 975, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (noting that scienter "cannot be satisfied by group pleading" because complaint must allege each individual defendant's fraudulent intent).

Second, Plaintiffs sufficiently plead a strong inference of scienter with respect to statements made about MF Global's internal controls and capital and liquidity risks. The CAC sufficiently pleads facts that each of the Officers knew or should have known about the weaknesses in MF Global's internal controls and capital and liquidity management. For example, the IAD issued several reports during the Class Period that criticized MF Global's existing policies and noted failures to follow those policies. Yet even in light of this information, the Officers made statements to the contrary and assured investors that MF Global's internal controls and capital and liquidity management were strong and adequate. "While a trier of fact might not ultimately agree," the Court finds that at this stage the CAC sufficiently pleads facts to give rise to a strong inference of scienter. *In re Lehman Bros.*, 799 F.Supp.2d at 297.

Corzine and MacDonald suggest that their purchases of MF Global stock during the Class Period negate an inference of scienter. (Corzine's Motion, p. 23–24; MacDonald's Motion, p. 15.) To be sure, under some circumstances such purchases might suggest a lack of fraudulent intent. *See In re MRU Holdings Sec. Litig.*, 769 F.Supp.2d 500, 516 (S.D.N.Y.2011). But this possibility alone cannot counteract the circumstantial evidence of fraudulent intent described above; such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud. *See Holmes v. Baker*, 166 F.Supp.2d 1362, 1378 (S.D.Fla.2001) (rejecting defendants' claim that insider purchases negated inference of fraudulent intent). Conceivably, as evidenced here, a relatively modest purchase in proportion to the loss amounts attributed to the alleged fraudulent conduct might be enough for officer defendants to claim the protection

of such a rule—even when they possess inside information about the true condition of the company and can control the timing of release of unfavorable information. Thus, even when courts note that insider trades suggest a lack of motive to commit fraud, they then proceed to consider whether the facts pled give rise to an inference of conscious misbehavior or recklessness. *See, e.g., Avon Pension Fund v. GlaxoSmithKline PLC*, 343 Fed.Appx. 671, 673–74 (2d Cir.2009); *In re MRU Holdings*, 769 F.Supp.2d at 515–17; *In re Bristol–Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 561–63 (S.D.N.Y.2004). Here, for the reasons described above, the CAC meets that threshold.

The Officers also propose various other inferences about their intent, such as a genuine belief that MF Global would succeed and that the Company's collapse resulted merely from a flawed business plan. (Corzine's Motion, p. 23–24; MacDonald's Motion, p. 15; Steenkamp's Motion, p. 20–21.) They argue that these inferences are "plausible, nonculpable explanations" that negate an inference of fraudulent intent. *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499. But at this stage, Plaintiffs need not show that the inference of fraudulent intent is "irrefutable ... or even the most plausible of competing inferences." *Id.* (citation and internal quotation marks omitted). Rather, Plaintiffs must only show that the inference of scienter is *"at least as likely as any plausible opposing inference."* *Id.* at 328, 127 S.Ct. 2499 (emphasis in original); *see also City of Pontiac Gen. Emps.' Ret. Sys.*, 875 F.Supp.2d at 372 ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). Given the facts described above which give rise to an inference of scienter, Plaintiffs have met this burden. After discovery, a fact finder will determine whether Plaintiffs can "demonstrate that it is *more likely* than not that

the defendant acted with scienter." *Tellabs*, 551 U.S. at 328, 127 S.Ct. 2499 (emphasis in original). In this regard, the Court notes that "[b]ecause discovery will be going forward in any case" on the Securities Act claims, dismissal at this stage is unwise because "a fact finder will be in a far better position to determine if [the Officers] acted with fraudulent intent following the close of discovery than the Court would be solely on the basis of the pleadings." *Citiline Holdings,* 701 F.Supp.2d at 516 n. 3.

### 2. *Control Persons Claims*

For the reasons stated above, the Court finds that the CAC sufficiently pleads a primary violation of Section 10(b) and the scienter required to establish culpable participation under Section 20(a). *See Alstom III,* 406 F.Supp.2d at 491. The Court also finds that the CAC adequately alleges each Officers' involvement in MF Global's operations to demonstrate control in the alleged violations, particularly in light of the generous standard that applies at the pleading stage. *See Katz,* 542 F.Supp.2d at 276. Thus, the Court finds that the CAC adequately states a claim as to Count Two of the complaint.

## D. *SECURITIES ACT DEFENSES*

Defendants raise various other arguments in support of their motions to dismiss the Securities Act claims. The Court addresses those arguments in turn.

### 1. *Liability for Forms 10–Q*

Section 11 holds a party liable for statements or omissions made in "any part of the registration statement, *when such part became effective.*" 15 U.S.C. § 77k(a) (emphasis added). A registration statement includes "any ... document ... incorporated therein by reference." 15 U.S.C. § 77b(a)(8). The Individual Defendants

allege that they are not liable under the Securities Act for statements made in MF Global's Forms 10–Q because those forms never became "effective" as to them. (Independent Directors' Motion, p. 11–13.) Plaintiffs counter that the Forms 10–Q became effective as to the Individual Defendants when they were incorporated by reference into the prospectuses that accompanied the offerings of the Secondary Offering, the 2016 Notes, the 2018 Notes, and the Senior Notes. (Plaintiffs' Opposition, p. 66–68.) The Individual Defendants respond that "prospectus supplements do not themselves become effective as to individuals," and thus the prospectuses (and the Forms 10–Q incorporated by reference in the prospectuses) did not become effective as to the Individual Defendants. (Independent Directors' Reply Motion, p. 1–2.)

Under SEC Rule 430B, a prospectus supplement "is deemed to be part of the registration statement" and, "for purposes of liability under [S]ection 11 of the [Securities] Act *of the issuer and any underwriter at the time only,*" establishes "a new effective date of the part of such registration statement relating to the securities to which such form of prospectus relates." 17 C.F.R. § 230.430B(f)(2) (emphasis added). The prospectus creates a new effective date for a director or individual signer only under certain limited exceptions. *See id.* § 230.430B(f)(4). At least one court has read this language to prohibit imposing Section 11 liability on individual defendants for statements made in a prospectus. *See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.,* 932 F.Supp.2d 1095 (C.D.Cal.2013). On the other hand, courts in this District have held individual defendants liable for statements incorporated by reference into a prospectus, *see In re Lehman Bros.,* 799 F.Supp.2d at 316 & n. 399, including those

made in Forms 10–Q, *see In re Citigroup, Inc. Bond Litig.,* 723 F.Supp.2d 568, 580, 594 (S.D.N.Y.2010).

The Court need not decide at this juncture whether the Individual Defendants are liable for statements in the Forms 10–Q. No party disputes that the Individual Defendants are liable for statements in the Forms 10–K, and no party disputes that the Underwriters and Senior Notes Underwriters are liable for statements in the Forms 10–Q. In light of the Court's rulings, discovery on all counts against all Defendants and with respect to all filings will go forward. The Court will have the opportunity to further define the contours of the claims after discovery.

### 2. *Reliance on Audited Statements*

Section 11 provides underwriters with an affirmative defense where they "had no reasonable ground to believe and did not believe" that the statements in a public filing misstated or omitted material facts. 15 U.S.C. § 77k(b)(3)(C); *see also In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 211 (S.D.N.Y.2003) (noting statutory command that "the burden of proof is on defendants to establish this defense"). The Underwriters and the Senior Notes Underwriters claim that the CAC insufficiently alleges that they were unreasonable in their reliance on audited financial statements. (Underwriters' Motion, p. 24–25; Senior Notes Underwriters' Motion, p. 20 n. 13.)

■ Underwriters' reliance on audited financial statements is reasonable "absent red flags that the underwriters were in a position to see." *In re Countrywide Fin. Corp.,* 588 F.Supp.2d at 1175. In other words, an underwriter can take advantage of this defense only if its reliance on the audited financial statements was "reasonable under the circumstances." *In re Software Toolworks, Inc.,* 50 F.3d 615, 624 (9th

Cir.1994). Where "red flags" make such reliance unreasonable, the underwriter must show that its investigation of those red flags was reasonable. *Id.; In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d 628, 679 (S.D.N.Y.2004) ("[T]he existence of red flags can create a duty to investigate even audited financial statements."). "[T]he standard for determining what constitutes a reasonable investigation and reasonable ground for belief is the same: '[T]he standard of reasonableness shall be that required of a prudent man in the management of his own property.'" *In re WorldCom, Inc.,* 346 F.Supp.2d at 663 (second alteration in original) (quoting 15 U.S.C. § 77k(c)).

■ Because the affirmative defense turns on an evaluation of reasonableness, whether the defense is available "is generally a fact issue, rarely suitable for summary judgment, let alone a motion to dismiss." *In re Countrywide Fin. Corp.,* 588 F.Supp.2d at 1175; *see also In re WorldCom, Inc.,* 346 F.Supp.2d at 673 ("It is equally important to note that what constitutes a red flag depends on the facts and context of a particular case."); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 597 (S.D.Tex.2003) ("[R]easonableness in this context is not a question properly resolved on a motion to dismiss." (internal quotation marks omitted)). Unless the defense "appears on the face of the [complaint]," *In re Countrywide Fin. Corp.,* 588 F.Supp.2d at 1182, a court should not dismiss the complaint merely for failure to "negate such an affirmative defense in their pleading," *In re Global Crossing,* 313 F.Supp.2d at 211.

Here, the affirmative defense does not appear on the face of the CAC. Indeed, though Plaintiffs need not allege red flags in their complaint, the CAC alleges that a reasonable investigation into the audited financial statements would have

revealed red flags and that a reasonable investigation into those red flags would have revealed MF Global's material misstatements and omissions. Plaintiffs also explain what a reasonable investigation would have revealed—specifically, that MF Global did not have sufficient evidence to avoid taking a valuation allowance against its DTA and that MF Global did not have sufficient internal controls to protect itself against a liquidity crisis. The CAC would be sufficient even without pleading red flags. *See In re OSG Sec. Litig.*, 971 F.Supp.2d 387, 401, 2013 WL 4885890, at *7 (S.D.N.Y. Sept. 10, 2013) ("Plaintiffs are not required to additionally plead red flags or facts negating the Underwriters' [reasonable reliance] defense."). Given that Plaintiffs have pled red flags, the CAC should not be dismissed based on a reasonable reliance defense. Whether the Underwriters and Senior Notes Underwriters did, in fact, reasonably rely on audited financial statements is a question of fact to be resolved after discovery.

3. *Evidence of Purchase*

▮ Several of the Underwriters and Senior Notes Underwriters seek dismissal of the Section 12(a)(2) claims (Counts Four, Seven, Ten, and Thirteen) because the CAC does not specifically allege that any named plaintiff purchased securities from those underwriters. (Underwriters' Motion, p. 3 n. 2; Senior Notes Underwriters' Motion, p. 25; Underwriters' & Senior Notes Underwriters' Reply, p. 3–4.) "A plaintiff has standing to bring a Section 12 claim only against a 'statutory seller' from which it 'purchased' a security." *In re Lehman Bros.*, 799 F.Supp.2d at 310. To have standing against an underwriter, a plaintiff must allege that he "purchased securities 'pursuant to' the pertinent offering documents." *Id.* at 311; *see also In re Alcatel Sec. Litig.*, 382

F.Supp.2d 513, 530 n. 8 (S.D.N.Y.2005) (restricting standing under Section 12(a)(2) to plaintiffs who purchased shares "pursuant to (i.e., in)" relevant public offering). The mere ability to trace back securities to the offering, without allegations of direct purchase, are insufficient. *In re Lehman Bros.*, 799 F.Supp.2d at 311; *see also Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F.Supp.2d 689, 712–13 (S.D.Ohio 2010) (dismissing Section 12(a)(2) claims against underwriters from whom plaintiffs did not allege that they purchased securities).

▮ In Count Four, the CAC alleges that a named plaintiff "purchased or otherwise acquired stock *from*" the relevant underwriters *"pursuant to* the Secondary Offering Materials." (CAC ¶ 576 (emphasis added).) In Count Seven, the CAC alleges that a named plaintiff "purchased or otherwise acquired MF Global's 2016 Notes *in* the 2016 Notes Offering." (CAC ¶ 609 (emphasis added).) In Count Ten, the CAC alleges that named plaintiffs "purchased or otherwise acquired MF Global's 2018 Notes *in* the 2018 Notes Offering." (CAC ¶ 643 (emphasis added).) And in Count Thirteen, the CAC alleges that a named plaintiff received title to the 6.25% Senior Notes from the relevant underwriters *"in* the 6.25% Senior Notes Offering." (CAC ¶ 678 (emphasis added).) These allegations are sufficient to establish standing against the Underwriters and the Senior Notes Underwriters for the purpose of withstanding a motion to dismiss. *See In re Scottish Re*, 524 F.Supp.2d at 400 ("[T]he Complaint adequately alleges that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the Offerings. A reasonable inference is that plaintiffs acquired their securities from the Underwriter Defendants.").

The CAC does allege, more particularly, that Plaintiffs purchased certain securities directly from certain underwriters. But such particularity is not *required* at the pleading stage. *See In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 374 (S.D.N.Y.2011) (declining to dismiss Section 12(a)(2) claims even though complaint failed "to identify which Underwriter Defendants sold particular securities to the named Plaintiffs"). It is enough, at this stage, for Plaintiffs to allege that they purchased securities "in" or "pursuant to" the relevant offerings. *See In re Lehman Bros.*, 799 F.Supp.2d at 310–11; *In re Alcatel*, 382 F.Supp.2d at 530 n. 8. Should it become apparent after a full factual record is established during discovery that Plaintiffs cannot prove direct purchases from certain individual underwriters, those underwriters will have the opportunity to seek judgment as a matter of law in a motion for summary judgment. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F.Supp.2d 615, 622 (S.D.N.Y.2001) (granting summary judgment on Section 12(a)(2) claim where undisputed facts showed that securities were not purchased through public offering).

#### 4. *Control Persons Claims*

For the reasons stated above, the Court finds that the CAC sufficiently pleads primary violations of Section 11. Even assuming that Plaintiffs must plead the Officers' culpable participation, *but see In re Bear Stearns*, 851 F.Supp.2d at 773 (noting that most courts in this District do not require an allegation of culpable participation in respect of Section 15(a) claims), the CAC sufficiently alleges culpable participation for the same reasons that it sufficiently alleges scienter.

The CAC also sufficiently alleges control under Section 15(a) for the same reasons that Plaintiffs adequately pled control under Section 20(a). *See Alstom III*, 406 F.Supp.2d at 487 n. 49 (noting that control under Section 20(a) and Section 15(a) are "interpreted in the same manner"). While MacDonald objects to certain counts on the grounds that he did not exercise control after he left the position of CFO, the fact-sensitive issue of control is better addressed after discovery has been completed. *See Katz*, 542 F.Supp.2d at 276.

### V. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Dkt. No. 368) of defendant Jon S. Corzine to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED;** and it is further

**ORDERED** that the motion (Dkt. No. 360) of defendant J. Randy MacDonald to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED;** and it is further

**ORDERED** that the motion (Dkt. No. 373) of defendant Henri J. Steenkamp to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED;** and it is further

**ORDERED** that the motion (Dkt. No. 357) of defendants David P. Bolger, Eileen S. Fusco, David Gelber, Martin J. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED;** and it is further

**ORDERED** that the motion (Dkt. No. 364) of defendants Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs & Co., J.P. Morgan Securities LLC, Merrill, Lynch, Pierce, Fenner & Smith Incorporated, and RBS Securities Inc. to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED;** and it is finally

**ORDERED** that the motion (Dkt. No. 366) of defendants BMO Capital Markets Corp., Commerz Markets LLC, Jefferies & Company, Inc., Lebenthal & Co., LLC, Natixis Securities North America Inc., Sandler O'Neill & Partners, L.P., and U.S. Bancorp Investments, Inc. to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED.**

**SO ORDERED.**

